KATHRYN LEE BOYD, ESQ. (SBN 189496)
RAJIKA L. SHAH, ESQ. (SBN 232994)
KRISTEN L. NELSON, ESQ. (SBN 269318)
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California 90048
Phone: (323) 302-9488
Fax: (323) 931-4990

VARTKES YEGHIAYAN, ESQ. (SBN 41773)
**YEGHIAYAN & ASSOCIATES**
535 N. Brand Boulevard, Suite 270
Glendale, California  91203
Phone: (818) 242-7400
Fax: (818) 242-0114

Attorneys for PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Alex BAKALIAN; Anais HAROUTUNIAN; and Rita MAHDESSIAN,<br>           Plaintiffs,<br>vs.<br>REPUBLIC OF TURKEY; CENTRAL BANK OF THE REPUBLIC OF TURKEY; T.C. ZIRAAT BANKASI; DOES 1-100.<br>           Defendants. | Case No. CV-10-09596-DMG-SSx<br><br>**DECLARATION OF PROF. ROGER ALFORD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION OF CENTRAL BANK OF THE REPUBLIC OF TURKEY AND T.C. ZIRAAT BANKASI TO DISMISS**<br><br>Date: December 19, 2011<br>Time: 9:30am<br>Department: Courtroom 7<br><br>Action filed: December 15, 2010<br>Judge: Hon. Dolly M. Gee |

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

**DECLARATION OF PROF. ROGER ALFORD**

1.     I, Roger Alford, am a tenured, full Professor of Law at Pepperdine University School of Law.  Beginning in January 1, 2012 I will move to Notre Dame Law School as a tenured, full Professor of Law.  I currently teach courses in, among other subjects, international law, international arbitration, international litigation, international trade, international business transactions, and international human rights.  Prior to taking the position at Pepperdine University, I served as a Senior Legal Advisor and Team Leader for the Claims Resolution Tribunal for Dormant Swiss Bank Accounts in Zurich, Switzerland, the international tribunal established by the Volcker Commission as part of the $1.25 billion settlement with the Swiss banks.  In that capacity I was personally involved in the resolution of hundreds of claims to Swiss bank accounts by victims of Nazi persecution.  I was in private practice with the law firm of Hogan & Hartson (now Hogan Lovells) in Washington, D.C. from 1994 to 1998, where I focused on international litigation, arbitration and trade, including litigation matters before federal courts and agencies and international tribunals.  In that capacity I litigated property claims brought by Russian and Indian corporations against Iraq before the United Nations Compensation Commission.  I clerked for the Honorable James Buckley of the District of Columbia Circuit Court of Appeals from 1994 to 1995.  I also served as a Legal Assistant to the Honorable Richard Allison of the Iran-United States Claims Tribunal from 1992 to 1994, the tribunal established by the United States and Iran pursuant to the Algiers Accords of 1979 to resolve international expropriation claims brought by United States' nationals against the Republic of Iran.  I received a J.D. from New York University School of Law, *with honors*, and an LL.M. from Edinburgh University, graduating first in my class.  I also routinely consult and serve as an expert witness on international law matters.  I served on the Executive Council of the American Society of International Law from 2002 to 2006 and currently serve on the Executive Committee of the Institute for Transnational

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

Arbitration. I have published dozens of articles and books on international arbitration, international litigation, and international law. My curriculum vitae is attached as Exhibit A. This background and training has afforded me expert knowledge on matters relevant to this proceeding.

2. The following statements are based on my own research regarding the international law obligations of the Republic of Turkey ("Turkey") with respect to property rights of its own citizens. If called upon, I could and would competently testify on the following matters.

I. **SUMMARY OF OPINION**

3. While American courts have stated the general rule that, "expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law," *Siderman v. Blake,* 965 F.2d 699, 711 (9th Cir. 1992); *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1105 (9th Cir. 1990), this rule of international law is subject to significant qualifications. Expropriation of property has been long recognized as a crime against humanity and as an international law violation when it is committed as part of a widespread or systematic attack directed against any civilian population, including one's own nationals.

4. As early as 1919 the Turkish confiscation of Armenian property and other crimes against Armenians were recognized as international law violations. Following the Second World War, the Armenian massacre was cited as a precedent for holding Nazi Germany liable under international law for the confiscation and destruction of property of German Jews.

5. Moreover, the general rule does not apply where an applicable international treaty prohibits a state from expropriating its own nationals' property. The *lex specialis* of the European Convention on Human Rights imposes international law

- 2 -

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

obligations on Turkey to protect property rights of Turkish nationals, and to compensate their own citizens for deprivations of property rights.

## II. EXPROPRIATION AS INTERNATIONAL LAW VIOLATION WHEN PART OF CRIME AGAINST HUMANITY

6. The genesis of the term "crime against humanity" originates with the Armenian massacre, when France, Great Britain, and Russia issued a joint declaration on May 24, 1915 denouncing the Ottoman government's massacre of the Armenian population of Turkey as constituting "crimes of Turkey against humanity and civilization." Cherif Bassiouni, INTERNATIONAL CRIMINAL LAW: SOURCES, SUBJECTS, AND CONTENTS, 440 (3d. ed. 2008); Timothy L.H. McCormack, THE LAW OF WAR CRIMES: NATIONAL AND INTERNATIONAL APPROACHES, 45 (1997). As early as 1919, the confiscation and destruction of Armenian property by Turkey (as successor to the Ottoman Empire) was recognized by the international community as a violation of international law.

7. In 1919, at the Paris Peace Conference, the Allies established a Commission to report on the atrocities committed by Germany, Austria-Hungary, Bulgaria and Turkey. The Commission concluded: "the war was carried on by the Central Empires together with their allies, Turkey and Bulgaria, by barbarous or illegitimate methods in violation of the established laws and customs of war and the elementary laws of humanity." *Commission on the Responsibility of the Authors of the War and of Enforcement of Penalties Violations of the Laws and Customs of War,* reprinted in 14 Amer. J. Int'l L. 95, 115 (1920). The 1919 Commission recommended that a "commission should be created for the purpose of collecting and classifying … information … in order to prepare as complete a list of facts as possible concerning the violations of the laws and customs of war committed by the forces of the German Empire and its Allies." *Id.* Among the enumerated offences

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

-3-

DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

identified were "pillage," "confiscation of property," "wanton devastation and destruction of property," and "wanton destruction of religious, charitable, educational, and historic buildings and monuments." *Id.* at 114-15. Annex I to the Commission Report included a summary of specific examples of offences committed, including "pillage committed by Turkish and German authorities against Turkish subjects," deportations of "more than a million Armenians" by Turkish authorities, and "massacres of Armenians by the Turks systematically organized with German complicity." Egon Schwelb, *Crimes Against Humanity,* 23 Brit. Y.B. Int'l L. 178, 181 (1946); U.S. Government Printing Office, Treaty of Peace with Germany, Hearings Before the Committee on Foreign Relations, U.S. Senate, Sixty-Sixth Congress, 335, 337, 341 (1919) (reprinting Annex I of 1919 Commission Report).

8.  The American delegates, among whom included U.S. Secretary of State Robert Lansing, opposed the establishment of an international tribunal to try war criminals, but recognized that "[a] wanton act which causes needless suffering (and this includes such causes of suffering as destruction of property…) is cruel and criminal. The full measure of guilt attaches to a party who without adequate reason perpetrates a needless act of cruelty. Such an act is a crime against civilization, which is without palliation." 1919 Commission, Annex II, reprinted in 14 Amer. J. Int'l L. at 151.

9.  Following the First World War, the Allies formally imposed conditions of peace that included Turkish recognition of its international law violations. Among the conditions imposed in the Treaty of Sèvres on the Ottoman Empire was the surrender of war criminals and Turkish consent to the establishment of an international tribunal to address the Armenian massacre. Article 230, in particular, provided that "[t]he Turkish Government undertakes to hand over to the Allied Powers the persons … responsible for the massacres committed during the continuance of the state of war on territory which formed part of the Turkish

-4-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Empire on August 1, 1914 … In the event the League of Nations … create[s] … a tribunal competent to deal with the said massacres … the Turkish Government undertakes equally to recognize such tribunal." Carnegie Endowment for International Peace, THE TREATIES OF PEACE 1919-1923, vol. II (1924). An international tribunal was never established with jurisdiction to prosecute the perpetrators of the Armenian massacre, but a Turkish Military Tribunal under the supervision of British occupying forces prosecuted convicted perpetrators of the crimes of plundering Armenian property, looting Armenian possessions, and destroying Armenian buildings. TAKVIMI VEKAYI (OTTOMAN PARL. OFFICIAL R. SUPPL.), No. 3540, May 5, 1919; TAKVIMI VEKAYI (OTTOMAN PARL. OFFICIAL R. SUPPL.), No. 3543, May 8, 1919; Vahakn Dadrian, *Genocide as a Problem of National and International Law: The World War I Armenian Case and Its Contemporary Legal Ramifications,* 14 Yale J. Int'l L. 221, 291-308 (1989); Israel Charney, ENCYCLOPEDIA OF GENOCIDE, vol. 2, 87-89 (1999). The Turkish Military Tribunal identified the looting and pillaging of Armenian property as crimes "entirely unacceptable to human and civilized sensibilities." TAKVIMI VEKAYI, (OTTOMAN PARL. OFFICIAL R. SUPPL.), No. 3617, August 7, 1919.

10.   As part of an amnesty agreement, Turkey agreed "not to contest" Allied efforts to assist the victims of the Armenian massacre to replace "legitimate proprietors in possession of their goods" and to establish an international commission to resolve Armenian "claims respecting persons and goods" with delegates chosen from the Red Cross, the Red Crescent and the Council of the League of Nations. Treaty of Lausanne, July 24, 1923, reprinted in TREATY WITH TURKEY AND OTHER INSTRUMENTS SIGNED AT LAUSANNE, 18 AM. J. INT'L L. 1, (Supp. 1924), Annex VIII, Declaration and Protocol for a General Amnesty Annexed to the Treaty of Lausanne, art. 6 (1923).

11.   Thus, in the immediate aftermath of the First World War—as evidenced by the Treaty of Sèvres, the Turkish Military Tribunals, and the Amnesty Declaration

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

of the Lausanne Agreement—Turkey itself recognized the confiscation and destruction of Armenian property as a violation of international law.

12. The destruction or confiscation of property as a crime against humanity was reinforced in the aftermath of the Second World War. Addressing the crimes of Nazi confiscation of German Jewish property was a key feature of international justice at Nuremberg. In 1945 the Charter of the International Military Tribunal included in Article 6(c) "crimes against humanity" within the Tribunal's jurisdiction and expressly included offences against *"any* civilian population, before or during the war." This language was designed to protect a broader category of civilian populations than war crimes, including "the civilian population of the respective belligerent itself, e.g. the German civilian population in its relations with the German authorities." Egon Schwelb, *Crimes Against Humanity,* 23 Brit. Y.B. Int'l L. at 189. This interpretation was consistent with longstanding norms of international law prohibiting crimes against humanity perpetrated against one's own civilian population. The British Chief Prosecutor at Nuremberg, Sir Hartley Shawcross, succinctly summarized the state of international law at this time: "Normally international law concedes that it is for the State to decide how it shall treat its own nationals; it is a matter of domestic jurisdiction …. Yet international law has in the past made some claim that there is a limit to the omnipotence of the State and that the individual human being, the ultimate unit of all law, is not disentitled to the protection of mankind when the State tramples upon his rights in a manner which outrages the conscience of mankind …. The same view was acted upon by the European Powers which in time past intervened to protect the Christian subjects of Turkey against cruel persecution …. [I]f, in order to strengthen or further their crimes against the community of nations, they debase the sanctity of man in their own country they act at their peril, for they affront the international law of mankind." Nuremberg Trial Proceedings, vol. XIX, 470-71 (July 26, 1946) (*available at* http://avalon.law.yale.edu/imt/07-26-46.asp).

-6-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

13. Applying its mandate to punish crimes against humanity, the Nuremberg Military Tribunal held that "acts by Germans against German nationals may constitute crimes against humanity within the jurisdiction of this Tribunal to punish." *United States v. Josef Altstoetter, et. al. (The Justice Case)*, III Trials of War Criminals 954 (1947) (*available at* http://www.loc.gov/rr/frd/Military_Law/pdf/NT_war-criminals_Vol-III.pdf).

14. In enumerating specific offenses, the Allies avoided "a rigid distinction between offences against life and limb, and those against property. Pillage, plunder, and arbitrary destruction of public and private property may, in their effects, be no less cruel and deserving of punishment than acts of personal violence. There may, in effect, be little difference between executing a person and condemning him to a slow death of starvation and exposure by depriving him of shelter and means of sustenance." Hersch Lauterpacht, *The Law of Nations and the Punishment of War Crimes,* 21 Brit. Y.B. Int'l L. 58, 79 (1944).

15. Consistent with that interpretation, the Nuremberg Military Tribunal included Nazi Germany's confiscation of real and personal property of German Jews as crimes against humanity. In the *Ministries Case,* the Nuremberg Military Tribunal determined that the expropriation of agricultural property from German Jews was a crime against humanity. *United States v. Ernst von Weizsaecker, et. al. (The Ministries Case),* XIV Trials of War Criminals 308 (1947), (*available at* http://www.loc.gov/rr/frd/Military_Law/pdf/NT_war-criminals_Vol-XIV.pdf). German decrees were "intended not only to bar Jews from agriculture, but also to rob them of a large part of the value of their property." *Id.* at 556. While Defendant Walther Darré, German Minister of Food and Agriculture, "may never have originated the plan to … rob German Jews, he fully implemented and enforced it without objection." *Id* at 557. Such action "constitutes a violation of international law within the jurisdiction of this Tribunal." *Id.* at 557. It also found that another defendant, Schwerin von Krosigk, Reich Minister of Finance, was guilty of

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

"violations of international law and crimes against humanity" for "confiscations carried on in the Reich and against Jews of German nationality." *Id.* at 678.

16. These early precedents provided the foundation for the modern doctrines of international humanitarian law, which recognizes as a crime against humanity the confiscation or destruction of property when committed as part of a widespread or systematic attack on any civilian population. *Prosecutor v. Tihomir Blaskic,* International Criminal Tribunal for Former Yugoslavia, Case No. IT-95-14-A (Appeals Chamber), ¶¶ 144-149, (July 29, 2004) (*available at* http://www.icty.org/x/cases/blaskic/acjug/en/bla-aj040729e.pdf); *Prosecutor v. Dario Kordić and Mario Ĉerkez,* International Criminal Tribunal for Former Yugoslavia, Case No. IT-95-14/2-A (Appeals Chamber), ¶¶ 108-09 (Dec. 17, 2004) (*available at* http://www.icty.org/x/cases/kordic_cerkez/acjug/en/cer-aj041217e.pdf); Jennifer Trahan, GENOCIDE, WAR CRIMES, AND CRIMES AGAINST HUMANITY: A TOPICAL DIGEST OF THE CASE LAW OF THE INTERNATIONAL CRIMINAL TRIBUNAL FOR THE FORMER YUGOSLAVIA, 276-82 (2006) (discussing the destruction or confiscation of property as a crime against humanity). This crime is recognized regardless of the nationality of the victim; crimes against humanity that target *any* civilian population are prohibited under international humanitarian law. *Prosecutor v. Sesay,* Special Court for Sierra Leone, Case No. SCSL-04-15-T, ¶ 80 (Mar. 2, 2009) (*available at* http://www.sc-sl.org/LinkClick.aspx?fileticket=D5HojR8FZS4%3d& tabid=215) (addressing crimes against humanity committed by Sierra Leone military commanders against Sierra Leone victims); *see also Prosecutor v. Dario Kordić and Mario Ĉerkez*, Case No. IT-95-14/2-T, Judgment, ¶ 205 (Feb. 26, 2001) (*available at* http://www.icty.org/x/cases/kordic_cerkez/tjug/en/kor-tj010226e.pdf) (conviction of Bosnian Croats of crimes against humanity for the plunder and wanton destruction of Bosnian Muslim property).

17. In the modern era there are numerous examples of the expropration or destruction of property of one's own nationals recognized as a violation of

8
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

international humanitarian law. Every major international criminal tribunal—the International Criminal Court, the International Criminal Tribunal for former Yugoslavia, the International Criminal Tribunal for Rwanda, the Extraordinary Chambers for the Courts of Cambodia, and the Special Court for Sierra Leone—recognizes that the widespread and systematic destruction or expropriation of the property of one's own nationals is a violation of international humanitarian law.

18. For example, the Indictment Chamber of the International Criminal Court has indicted Sudanese military leader, Ali Kushayb, of fifty-one counts, including four counts of crimes against humanity for the destruction of property (Counts 1, 10, 21, and 39), and seven counts of war crimes for pillage and destruction of property (Counts 8, 18, 19, 36, 38, 49, 50) of Sudanese nationals' property in the Arawala, Bindisi, Kodoom, and Mukjar, and Arawala villages and surrounding areas of Darfur. Warrant of Arrest for Ali Kushayb, ICC-02/05-01/07, (Apr. 27, 2007). The indictment and arrest warrant is based on the fact that "there are reasonable grounds to believe that … the Sudanese Armed Forces and the Milita/Janjaweed committed several criminal acts against civilians … namely … destruction of property belonging to the above-mentioned populations and pillaging of towns." *Id.* at 3. *See also* Warrant of Arrest for Ahmad Harun, ICC-02/05-01/07, (Apr. 27, 2007) (ten counts of war crimes or crimes against humanity against Sudanese Minister of Interior for destruction of property or pillaging of Sudanese nationals' property).

19. The International Criminal Tribunal for Former Yugoslavia indicted Slobodan Milosevic, President of Serbia, of crimes against humanity for "[t]he wanton destruction or damage of Kosovo Albanian religious sites" and the "deliberate and widespread or systematic campaign of destruction of property owned by Kosovo Albanian civilians" while Kosovo was still part of Serbia. *Prosecutor v. Milosevic*, Second Amended Indictment "Kosovo", Case No. IT-99-37-PT, ¶¶ 56, 68 (Oct. 16, 2001). It also indicted a Bosnian Serb, Radoslav

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

Brdjanin, of international humanitarian law violations for the "unlawful and wanton extensive destruction and appropriation of property" belonging to Bosnian Muslims and Bosnian Croats. *Prosecutor v. Radoslav Brdjanin*, Fourth Amended Indictment, Case No. IT-99-36-PT, (Dec. 10, 2001).

20. The International Criminal Tribunal for Rwanda indicted a Lieutenant Colonel in the Rwandan Army, Ephrem Setako, of the war crime of pillage as a result of "attacks by the militiamen and soldiers … directed at the property of the civilian population" of Rwanda and "loot[ing] and destroy[ing] the property of the Tutsi civilian population" in Rwanda. *Prosecutor v. Ephrem Setako*, Case No. ICTR-2004-81-1 (June 23, 2008).

21. The Extraordinary Chambers in the Courts of Cambodia ("ECCC") has indicted four Cambodian Khmer Rouge leaders for crimes against humanity as a result of the "widespread imposition of collective living conditions" during the Cambodian genocide, where Cambodian victims were obligated "to live in cooperatives [leading] to the expropriation of all property." *Co-Prosecutors v. Nuon, et. al.,* Closing Order (Indictment), Case File No. 002/19-09-2007-ECCC-OCIJ, ¶¶ 1350, 1355 (Sept. 15, 2010).

22. The Special Court for Sierra Leone has indicted three leaders of the rebel army, Revolutionary United Front, for the crime of pillage as a result of the widespread, unlawful taking of civilian property in the context of Sierra Leone's civil war. The Court expressly recognized "pillage" as a violation of international law and concluded "that the terms 'pillage,' 'plunder' and 'spoliation' have been varyingly used to describe the unlawful appropriation of private or public property in armed conflict," whether it be a civil war or an international armed conflict. *Prosecutor v. Sesay*, Judgment, Case No. SCSL-04—15-T, ¶ 205 (Mar. 2, 2009).

23. These international tribunals recognize that international humanitarian law protects the destruction or expropriation of property as part of a widespread and systematic attack against *any* civilian population, including persecution against

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

-10-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

one's own nationals.

### III. EXPROPRIATION AS A VIOLATION OF THE ECHR

24.    In the aftermath of the Second World War, Member States of the United Nations unanimously adopted the Universal Declaration of Human Rights in 1948, recognizing that "[e]veryone has the right to own property" and that "[n]o one shall be arbitrarily deprived of his right to property." Universal Declaration of Human Rights, art. 17, G.A. Res. 217A, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc. A/810 (Dec. 10, 1948).  In order to supplement that non-binding declaration (which now reflects customary international law), the nations of Europe adopted the European Convention of Human Rights as a binding treaty applicable to every member state of the Council of Europe. European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221 ("ECHR" or "European Convention").

25.    Protocol I of the ECHR, adopted in 1952, provides that "[e]very natural or legal person is entitled to the peaceful enjoyment of his possessions" and that "[n]o one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law." Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms, art. 1, Mar. 20, 1952, 213 U.N.T.S. 221 ("Protocol I"). Thus, every Member State that has ratified Protocol I of the ECHR has recognized an international law violation for the unlawful expropriation of its own citizens' property.  This is an obligation Turkey has recognized since May 18, 1954 when it ratified the ECHR and Protocol I.

26.    These ECHR treaty obligations of Turkey are not declaratory, non-binding international commitments.  They have the force of law, both internationally and within the Turkish domestic legal system.  Article 90 of the Turkish Constitution

-11-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

provides that "[i]nternational treaties duly put into effect have the force of law. No appeal to the Constitutional Court can be made with regard to these treaties on the ground that they are unconstitutional. In the case of a conflict between international treaties in the area of fundamental rights and freedoms duly put into effect and the domestic laws, due to differences in provisions on the same matter, the provisions of international agreements shall prevail." The Constitution of the Republic of Turkey, art. 90 (amended 2004). As Article 90 makes clear, Turkey is a "monist state" that treats international law as directly incorporated into Turkish domestic law. (The United States, by contrast, is a "dualist state" that requires implementing legislation or self-executing treaties for international law to have domestic effect). Moreover, as the final sentence of Article 90 makes clear, the Turkish Constitution has adopted an "international Supremacy Clause" that places international treaties ratified by Turkey above the Constitution of Turkey. As the President of the Constitutional Court of Turkey stated, "Thanks to this provision [in Article 90 of the Turkish Constituion], disputes over the status of human rights treaties have come to an end. The courts of general jurisdiction [in Turkey] are now obliged to apply the [European] Convention provisions in their judgments. Recent judgments [in Turkey] … disclose direct application of the provisions of the European Convention and other international treaties on human rights." Speech Given by Mrs. Tülay Tuğcu, (Jan. 20, 2006), reprinted in ECHR ANNUAL REPORT 2005, 29, 32 (2005). In other words, the international obligations set forth in the ECHR are the supreme law of the land in Turkey, and are enforced not only before the European Court of Human Rights, but also by Turkish courts.

27. Despite these efforts, Turkey continues to struggle with international human rights violations, including violations of the right to property guaranteed to Turkish nationals under the ECHR. Turkey is routinely recognized as having the most human rights violations of all forty-seven Member States of the European Convention. *See, e.g.,* ECHR ANNUAL REPORT 2010, 14 (278 judgments against

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

-12-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

Turkey, higher than any other Member State); ECHR ANNUAL REPORT 2009, 12 (356 judgments against Turkey, higher than any other Member State); ECHR ANNUAL REPORT 2008, 12 (264 judgments against Turkey, higher than any other Member State); ECHR ANNUAL REPORT 2007, 13 (331 judgments against Turkey, higher than any other Member State). Turkey's human rights record is so poor that the ECHR has rendered 2,245 judgments finding Turkey in violation of its ECHR obligations, more than the combined total number of judgments finding ECHR violations rendered against thirty-four other countries (Albania, Andorra, Armenia, Austria, Azerbaijan, Belgium, Bosnia and Herzegovina, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, Georgia, Germany, Hungary, Iceland, Ireland, Latvia, Liechtenstein, Lithuania, Luxembourg, Monaco, Montenegro, Netherlands, Norway, Portugal, San Marino, Serbia, Spain, Sweden, Switzerland, Yugoslavia, and the United Kingdom). European Court of Human Rights, COUNTRY FACT SHEETS 1959-2010.

28. Violations against Turkish nationals' property rights contribute significantly to Turkey's poor record of compliance with its ECHR obligations. *See, e.g., Case of N.A. and Others v. Turkey,* Case No. 37451/97 (2006) (annulment of title to property owned by Turkish nationals a violation of Protocol I of the ECHR); *I.R.S. and Others v. Turkey*, Case No. 26338/95 (2004) (twenty-years of adverse possession by the State without compensation a violation of Protocol I of the ECHR); *Öneryildiz v. Turkey*, Case No. 48939/99 (2004) (destruction of Turkish national's home and possessions a violation of Protocol I of the ECHR); *Şirin Yılmaz v. Turkey*, Case No. 35875/97 (2004) (damage to Turkish national's property as a result of shelling by security forces a violation of Protocol I of the ECHR); *Yiltaş Yıldız Turistik Tesisleri A.S. v. Turkey*, Case No. 30502/96, (2003) (failure to pay timely and full compensation for expropriation of Turkish company's property a violation of Protocol I of the ECHR); *Akkus v. Turkey*, Case No. 60/1996/679/869 (1997) (expropriation without compensation of land owned

-13-
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

by a Turkish national in order to construct a dam a violation of Protocol I of the ECHR); *Akdivar v. Turkey,* Case No. 99/1995/605/693 (1996) (evictions, forced relocations, and demolition of villages a violation of Turkish nationals' rights under Protocol I of the ECHR).

29. Turkey may seek to defend its record on human rights, but given its ECHR commitments, it cannot deny that Turkish nationals enjoy international law guarantees with respect to the use and enjoyment of their property, and that Turkey's deprivations of Turkish nationals' property rights are an international law violation.

30. There remains, of course, the question of *ratione temporis* for offences that occurred prior to the Turkey's ratification of the ECHR. The European Court of Human Rights recognizes the international law rule of non-retroactivity. *Blečić v. Croatia*, Case No. 59532/00 (2006); *see also* Vienna Convention on the Law of Treaties, art. 28, May 23, 1969, 1155 U.N.T.S. 331 ("Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party."). However, ECHR treaty obligations apply to deprivations of property rights that are violations continuing after the entry into force of the Convention. *See, e.g. Xenides-Arestis v. Turkey,* Case No. 46347/99 (2005) (with respect to Greek Cypriot's claim against Turkey for dispossession of property in 1974 and thereafter, "the Court … concludes that there has been and continues to be a violation of Article 1 of Protocol 1 by virtue of the fact that the applicant is denied access to and control, use and enjoyment of her property and any compensation for the interference with her property rights."); *Eugenia Michaelidou Developments Ltd and Michael Tymvios v. Turkey*, Case No. 16163/90 (2003) ("The Court … concludes that there has been and continues to be a violation of Article 1 of Protocol No. 1 by virtue of the fact that the applicant is denied access to and

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

control, use and enjoyment of his property as well as any compensation for the interference with his property rights."); *Demades v. Turkey,* Case No. 16219/90 (2003) (The Court … concludes that there has been and continues to be a violation of Article 1 of Protocol No. 1 to the Convention by virtue of the fact that the applicant is denied access to and control, use and enjoyment of his property as well as any compensation for the interference with his property rights."); (*Cyprus v. Turkey*, Case No. 25781/94 (2001) ("The continuing and total denial of access to their property is a clear interference with the right of the displaced Greek Cypriots to the peaceful enjoyment of possession with the meaning of the first sentence of Article 1 of Protocol 1.  It further notes that, as regards to the purported expropriation, no compensation has been paid to the displaced persons in respect of the interferences which they have suffered and continue to suffer in respect of their property rights."); *Loizidou v. Turkey*, Case No. 15318/89 (1996) (Turkish deprivation of Greek Cypriot's property rights in 1974 is a continuing violation that constitutes an interference with property rights under Protocol I of the ECHR).

31.  *Ratione temporis* also applies where the interference falls outside the temporal jurisdiction of the Court, but domestic law generates legitimate expectations for compensation after the European Convention entered into force. *See, e.g., Almeida Garret v. Portugal,* Case No. 29813/96 (2000) (applicant did not complain about deprivation of property that occurred beyond its temporal jurisdiction, but about the failure to pay compensation afforded to claimants by domestic legislation; "uncertainty, coupled with the lack of any effective domestic remedy for rectifying the situation, that leads the Court to find … there has been a violation of Article 1 of Protocol No. 1."); *Hingitaq and Others v. Denmark*, Case No. 18584/04 (2006) (Inughuit tribe in Greenland complained of restrictions on hunting and fishing rights resulting from establishment of Thule Air Base in 1951 and relocation of population in 1953; unsuccessful outcome of proceedings in Danish courts filed in 1996 constitutes interference with property rights under

SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  Protocol I of the ECHR).

2  32.  Thus, the general rule of international law that "expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law," see *Siderman*, 965 F.2d at 711; *Chuidian*, 912 F.2d at 1105, does not apply where a treaty operates as *lex specialis* to extend property rights to Turkish nationals and renders Turkey in violation of international law for the failure to guarantee those rights.

3  33.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 23rd day of November 2011, at Malibu, California.

_____
Prof. Roger Alford

- 16 -
DECL. OF R. ALFORD ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048