KATHRYN LEE BOYD, ESQ. (SBN 189496)
RAJIKA L. SHAH, ESQ. (SBN 232994)
KRISTEN L. NELSON, ESQ. (SBN 269318)
**SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
6310 San Vicente Boulevard, Suite 360
Los Angeles, California  90048
Phone: (323) 302-9488
Fax: (323) 931-4990

VARTKES YEGHIAYAN, ESQ. (SBN 41773)
**YEGHIAYAN & ASSOCIATES**
535 N. Brand Boulevard, Suite 270
Glendale, California  91203
Phone: (818) 242-7400
Fax: (818) 242-0114

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Alex BAKALIAN;  Anais HAROUTOUNIAN; and Rita MAHDESSIAN,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>REPUBLIC OF TURKEY; CENTRAL BANK OF THE REPUBLIC OF TURKEY; T.C. ZIRAAT BANKASI; DOES 1-100.<br>　　　　　Defendants. | Case No. CV-10-09596-DMG-SSx<br><br>**DECLARATION OF PROF. TANER AKÇAM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION OF CENTRAL BANK OF THE REPUBLIC OF TURKEY AND T.C. ZIRAAT BANKASI TO DISMISS**<br><br>Date: December 19, 2011<br>Time: 9:30am<br>Department: Courtroom 7<br><br>Action filed: December 15, 2010<br>Judge: Hon. Dolly M. Gee |

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

1

2

## DECLARATION OF PROFESSOR TANER AKÇAM, Ph.D.

3   **I, Taner Akçam, hereby declare and state as follows:**

4   1.      I am Professor of History at The Strassler Family Center for Holocaust and

5   Genocide Studies at Clark University in Massachusetts, where I hold the Robert

6   Aram and Marianne Kaloodian and Stephen and Marion Mugar Chair in Armenian

7   Genocide Studies.

8   2.      I completed my undergraduate studies in Turkey at Middle East Technical

9   University, where I obtained a B.A. in Administrative Sciences in 1975. I received

10  a Ph.D. in Sociology and History from the University of Hannover (Gottfried

11  Wilhelm Leibnitz Universität), Germany, in 1996. I was appointed as a Research

12  Scientist at the Hamburger Institut für Sozialforschung in 1988. In 2000 I was

13  appointed as a Visiting Scholar at the Armenian Research Center, University of

14  Michigan, Dearborn. I was appointed in 2001 as a Visiting Professor of Sociology

15  at the University of Michigan, Ann Arbor, and in 2002 I was appointed as a

16  Visiting Professor of History at the University of Minnesota, Minneapolis.

17  Concurrently with the latter service, I was appointed to the faculty of the Genocide

18  and Human Rights University Program, International Institute for Genocide and

19  Human Rights Studies, serving as Professor of Record for accreditation by the

20  University of Minnesota. I was appointed to my current position and chair at Clark

21  University in 2008.

22  3.      I am the author of eleven books, thirty-five articles, and five book reviews on

23  the Armenian Genocide and related subjects such as Turkish national identity and

24  human rights, including *Young Turks' Crime Against Humanity: The Armenian*

25  *Genocide and Ethnic Cleansing in the Ottoman Empire*, (Princeton University

26  Press, forthcoming in March 2012); *Judgment at Istanbul: The Armenian Genocide*

27  *Trials,* (co-authored with Vahakn Dadrian, Berghahn Books, New York 2011),

28  *Essays on 1915* (in Turkish, İletişim Yayınları, 2010); *Deportation and Massacres,*

- 1 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

1   *Protocols of the Military Tribunal: The Trial of the Union and Progress Party*

2   *(1919–1922)* (co-authored with Vahakn N. Dadrian, in Turkish, Bilgi University

3   Press, 2009); *"The Armenian Problem is Solved": Policies Towards Armenians*

4   *During the War Years According to Ottoman Documents* (in Turkish, İletişim

5   Publishing House, 2008); *A Shameful Act: The Armenian Genocide and the*

6   *Question of Turkish Responsibility* (Metropolitan Books, 2006, Minnesota Book

7   Award); *From Empire to Republic: Turkish Nationalism and the Armenian*

8   *Genocide* (Zed Books, 2004); *Dialogue Across an International Divide: Essays*

9   *Towards a Turkish-Armenian Dialogue* (The Zoryan Institute of Canada, 2001);

10   *The Armenian Taboo Exposed* (in Turkish, Su Yayınları, 2000); *The Armenian*

11   *Question and Human Rights in History: From the Party of Union and Progress to*

12   *the Turkish War of Independence* (in Turkish, İmge Yayınları, 1999); *Armenians*

13   *and the Genocide: The Turkish National Movement and the Istanbul Trials, 1919–*

14   *22* (in German, Verlag Hamburger Edition, 1996); and *The Armenian Question and*

15   *Turkish National Identity* (in Turkish, İletişim Yayınları, 1992). I serve on the

16   editorial board of *Genocide Studies and Prevention,* the official journal of the

17   International Association of Genocide Scholars.

18   4.      The following statements are based on my own research of the documentary

19   records of the Entente Powers (France, Great Britain and Russia) of World War I as

20   well as the records of the United States, the Ottoman Empire and the Republic of

21   Turkey concerning the view of the international community regarding the murder,

22   deportation, and confiscation of Armenian property in Ottoman Turkey between

23   1915 and 1923. If called upon, I could and would competently testify on the

24   following matters.

25   5.      Based upon my own historical research and investigation, it is my opinion

26   that the murder, deportation and confiscation of property of Armenians living in the

27   Ottoman Empire between 1915 and 1923 were found to be violations of

28   international law at the time they occurred or shortly thereafter by both the

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  international community as well as national tribunals within Turkey. I set out below

2  the bases for this opinion.

3  6.      On May 24, 1915, France, Great Britain and Russia issued a joint declaration

4  specifically condemning the Turkish massacres of Armenians and called them

5  "crimes of Turkey against humanity and civilization." The full text of the joint

6  declaration was sent to the United States Department of State in Washington D.C.

7  from its Embassy in Constantinople (modernly Istanbul) and reads as follows:

8
9
10
11
12
13
> For about a month the Kurd and Turkish populations of Armenia has
> been massacring Armenians with the connivance and often assistance
> of Ottoman authorities…. In view of those new crimes of Turkey
> against humanity and civilization, the Allied governments announce
> publicly to the Sublime-Porte that they will hold personally
> responsible [for] these crimes all members of the Ottoman
> government and those of their agents who are implicated in such
> massacres.

14  (United States Dept. of State, *Papers relating to the foreign relations of the United*

15  *States, 1915, Supplement, The World War* (1915) p. 981). The immediate reason for

16  this declaration was the news coming to Europe about the massacres and killings of

17  Armenians. However this declaration was the product of a long tradition of

18  humanitarian intervention of European powers related to human right abuses in the

19  Ottoman Empire since the beginning of the 19th century.

20  7.      In January 1919, the United States, Great Britain, France, Italy and Japan

21  convened in Paris. The countries established a commission, known as the

22  Commission of Fifteen, to consider which crimes had been committed during

23  World War I. What happened with the Turks was one of the most important issues

24  discussed. The Commission's report contained an enumerated list of international

25  crimes, which were found to have been committed during the war. *Commission on*

26  *the Responsibility of the Authors of the War and on Enforcement of Penalties:*

27  *Report*, 14 Am. J. Int'l L. 95, 114 (1920). These specific crimes included "(7)

28  Deportation of civilians  . . . (14) Confiscation of property . . .  (18) Wanton

- 3 -

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

1   devastation and destruction of property . . . [and] (20) Wanton destruction of

2   religious, charitable, educational, and historic buildings and monuments." *Id.* at

3   115. The crimes considered by the Commission can be classified according to two

4   categories. The first involved crimes committed by one state against the armed

5   forces of another state or its subjects while under occupation. The second category

6   was for crimes committed by Germany and Turkey against their own citizens on

7   their own sovereign territory. *Id.* at 112–115. The main crime under this second

8   category was the Turkish massacres of Armenians and Greeks. *Id.* at 113. The

9   Commission used the term crime against the "laws of humanity" as a separate crime

10  category distinct from crimes against "laws and customs of war." By doing so, the

11  commission, for the first time, made a distinction between "war crimes" and

12  "crimes against humanity." The Commission also stated that the "gravity of these

13  outrages upon the principles of the law of nations and upon international good faith

14  is such that they should be made the subject of a formal condemnation by the

15  Conference." *Id.* at 120. In particular, the Commission believed that in the future,

16  "penal sanctions should be provided for such grave outrages against the elementary

17  principles of international law." *Id.* at 120. Specifically, it concluded that pursuant

18  to the "Violations of the Laws and Customs of War and of the Laws of Humanity":

19
20  *Every belligerent has, according to international law, the power and
    authority to try the individuals alleged to be guilty of the crimes of
    which an enumeration has been given in Chapter II on Violations of*
21  the Laws and Customs of War, if such persons have been taken
22  prisoners or have otherwise fallen into its power.

23  *Id.* at 121 (emphasis added).

24  8.      As a result of the report from the Commission of Fifteen, both the Treaty of

25  Versailles with Germany and the Treaty of Sèvres with the Ottoman Empire

26  contained clauses on the subject of prosecution of those individuals alleged to have

27  committed violations of international law. The most relevant clause in the Treaty of

28  Sèvres is Article 230, which reads as follows:

- 4 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

ARTICLE 230.
The Turkish Government undertakes to hand over to the Allied
Powers the persons whose surrender may be required by the latter as
being responsible for the massacres committed during the continuance
of the state of war on territory which formed part of the Turkish
Empire on August 1, 1914.

The Allied Powers reserve to themselves the right to designate the
tribunal which shall try the persons so accused, and the Turkish
Government undertakes to recognise such tribunal.
In the event of the League of Nations having created in sufficient time
a tribunal competent to deal with the said massacres, the Allied
Powers reserve to themselves the right to bring the accused persons
mentioned above before such tribunal, and the Turkish Government
undertakes equally to recognise such tribunal.

Carnegie Endowment for International Peace, THE TREATIES OF PEACE 1919-1923,
vol. II (1924). Article 230 thus was intended to put on trial those who had
committed crimes against humanity. However, the Treaty of Sèvres ultimately
never came into effect, due to questions concerning the territorial integrity of the
Ottoman Empire.

9.      The years between 1919 and 1922 were a transitional period. There were two
political centers in the Ottoman empire; one was Ankara (headquarters of the
Turkish nationalist movement) and the other was Istanbul (Ottoman government).
The two political centers worked together in the negotiations leading up to the
Sèvres agreements and did not oppose the clauses in Sèvres regarding the
punishment of perpetrators of the crimes of 1915; in fact, just the opposite. In a
common protocol signed in October 1919 for the election of a new Ottoman
Parliament, the Ankara and Istanbul centers called the criminal investigations
"judicially and politically necessary." It is important to underline that, during this
time, everyone, including the Turkish nationalists, was in agreement that what
happened to the Armenians was a crime and these crimes should not be left
unpunished. *See also* Taner Akçam, Vahakn Dadrian, *Judgment at Istanbul, The*

- 5 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)

1    *Armenian Genocide Trials* (Berghahn Books, New York 2011). The leader of the

2    Turkish Nationalist movement, later the founder of the Turkish republic, Mustafa

3    Kemal Atatürk, characterized the 1915 crimes as "a shameful act." In a letter to the

4    Istanbul government in September 1919 he emphasized that it was important to

5    "make it understood that the reign of law has begun, with impartiality and proper

6    justice." As a result of this policy, trials were held in Istanbul for those responsible

7    for organizing the deportation and massacre of Armenians.

8    10.     The Sèvres agreement was superseded by the Treaty of Lausanne, which was

9    signed on July 24, 1923. Several countries proposed the inclusion of a thirteen-

10    article section covering the protection of minorities. Their proposed third article

11    read: "The Turkish government reports that it accepts the results of efforts from 30

12    October 1918 to the present to return individuals who, from 1 August 1914 to the

13    present either disappeared or were separated from their families—no matter what

14    their numbers and religions might be—either to their families or their communities,

15    and to return their property to people who were deprived of it in an unlawful and

16    unsystematic manner. Turkey will make all efforts to help so that these efforts are

17    not interrupted." (*Lozan Barış Konferansı Tutanaklar Belgeler,* trans. Seha L.

18    Meray, Series 1, vol. 1, bk. 2(İstanbul: Yapı Kredi Yayınları, 1993), at 161).

19    Turkey definitively declared that it would not accept the proposed Article 3 about

20    the return of Armenian refugees and property, claiming the issue belonged to the

21    past. (*Id.* at 184.) Thus, Article 4 of the final draft of the Treaty of Lausanne

22    incorporated a General Amnesty agreement for "Turkish nationals, and reciprocally

23    nationals of the other Powers signatory of the Treaty of Peace signed this day who

24    may have been arrested, prosecuted or sentenced by the authorities of the said

25    Powers or by the Turkish authorities respectively, for reasons of a political or

26    military nature previous to the 20th November, 1922, on territory which remains

27    Turkish in accordance with the said Treaty of Peace." TREATY WITH TURKEY AND

28    OTHER INSTRUMENTS SIGNED AT LAUSANNE, 18 AM. J. INT'L L. 1, (Supp. 1924),

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  Annex VIII, Declaration and Protocol for a General Amnesty Annexed to the Treaty

2  of Lausanne, art. 4 (1923).

3  11.    The granting of amnesty is important; if there were no crimes committed by

4  the Turkish leaders then no amnesty would be required. The grant of amnesty in the

5  Treaty of Lausanne confirms, therefore, that the international community,

6  represented by the signatories to the Treaty, considered that the actions taken by the

7  Turkish leaders – including the murder and deportation of Ottoman Armenians and

8  the confiscation of their property – amounted to international crimes. (M. Cherif

9  Bassiouni, *Crimes Against Humanity in International Law* 67-69 (2d ed. 1999). The

10  amnesty clause in Lausanne actually comports with and confirms the crimes

11  pronounced in the Commission of Fifteen report.

12  12.    In addition to statements by the international community as reflected in the

13  1915 joint declaration, the report of the Commission of Fifteen, and the Treaties of

14  Sèvres and Lausanne, the Turkish courts themselves arrive at the same conclusion

15  that the murder, deportation and confiscation of property of Armenians living in the

16  Ottoman Empire between 1915-1923 were violations of national and international

17  law.

18  13.    Following the signing of the Armistice, the Ottoman government established

19  an extraordinary courts-martial or military tribunal. This tribunal, applying Turkish

20  domestic law, found that the acts of the Turkish leaders amounted not only to

21  Turkish crimes under the Ottoman Penal Code, but also amounted to crimes against

22  the "conscience of humanity" and "universal norms" After examining the acts taken

23  by the Committee of Union and Progress leaders with regard to the Ottoman

24  Armenians, the tribunal concluded that the CUP had not only failed to protect the

25  Armenian detainees, but caused "all manner of slaughter, looting and pillaging,

26  such as are *entirely unacceptable to human and civilized sensibilities*." (Takvimi

27  Vekayi # 3617, Yozgat Case, 7 August 1919 (emphasis added)). In another case,

28  the court categorized the crimes as being against "Islam and Ottoman laws … and

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1  *the universal rule of law.*" (Takvim–i Vekayi # 3618, Büyükdere Case, 9 August

2  1919 (emphasis added)).

3  14.    In their core element these findings of the military tribunals famously echo,

4  in summary form, the international community's historical proclamation some four

5  years earlier on 24 May 1915, which had condemned the perpetration of the then-

6  ongoing "massacres" and warned the Ottoman government of dire consequences.

7  The government was accused of "connivance and often assistance" in the

8  organization of these massacres. More important, these threats proved instrumental

9  in legally enshrining the international criminal law of "crimes against humanity."

10  (Taner Akçam, Vahakn Dadrian, *Judgment at Istanbul,* p. 2).

11

12  I declare under penalty of perjury under the laws of the United States that the

13  foregoing is true and correct.

14

15  Executed on the 23rd of November, 2011 at _____8:55 pm_____.

16

17

18  Worcester MA

19                    PROF. TANER AKÇAM, PhD.

20

21

22

23

24

25

26

27

28

- 8 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

DECL. OF TANER AKÇAM ISO PLAINTIFFS' OPP. TO MOT. OF CENTRAL BANK AND ZIRAAT BANK TO DISMISS
Case No. 2:10-CV-09596-DMG-(SSx)