```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                        ---

 4         HONORABLE DOLLY M. GEE, JUDGE PRESIDING

 5                        ---

 6

 7

 8   GARBIS DAVOYAN,                    )
     individually on behalf of all     )
 9   others similarly situated,        )
                                       )
10                                     )
                                       )
11              Plaintiffs,            )
                                       )No. 10-CV-05636
12        VS                           )
                                       )
13   REPUBLIC Of TURKEY, et al,        )
                                       )
14                                     )
                Defendants.            )
15   _____)

16

17        Reporter's Transcript of Proceedings
                   Motion Hearing
18            Los Angeles, California
             Monday, December 19, 2011
19

20

21

22

23        Anne Kielwasser, CSR, RPR
          Federal Official Court Reporter
          312 North Spring Street, Room 432
24        Los Angeles, California 90012
          Telephone: (213) 894-2969
25        annekielwasser@gmail.com
             AKcourtreporting.com
```

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4   MARK JOHN GERAGOS
     SHELLEY KAUFMAN
 5   Geragos & Geragos
     644 South Figueroa Street
 6   Los Angeles, CA 90017
     Tel:  213-625-3900
 7   Fax:  213-625-1600
     Email:  Mark@geragos.com
 8
     SCOTT MATTHEW MALZAHN
 9   Kabateck Brown Kellner LLP
     644 South Figueroa Street
10   Los Angeles, CA 90017
     213-217-5000
11   Fax:  213-217-5010
     Email:  Sm@kbklawyers.com
12
     K. LEE CRAWFORD BOYD
13   Schwarcz Rimberg Boyd & Rader, LLP
     6310 San Vicente Boulevard
14   Suite 360
     Los Angeles, CA 90048
15   Tel:  323-302-9488
     Fax:  323-931-4990
16   Email:  Lboyd@srbr-law.com

17

18   ON BEHALF OF THE DEFENDANTS:

19   NEIL M SOLTMAN
     MATTHEW HENRY MARMOLEJO
20   Mayer Brown LLP
     350 South Grand Avenue
21   Suite 2500
     Los Angeles, CA 90071-1503
22   Tel:  213-229-9500
     Fax:  213-625-0248
23   Email:  Nsoltman@mayerbrown.com

24

25
         (Appearances continued)
```

1                    APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANTS:

4

     **DAVID SALTZMAN**
5    Saltzman & Evinch PC
     655 Fifttenth Street NW Suite 255 F
6    Washington, document 20005
     202-637-9877
7    Fax:  202-637-9876
     Email:  Dsaltzman@turklaw.net
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    MONDAY, DECEMBER 19, 2011                    10:00 A.M.

 2                           ~ ~ ~

 3                    P R O C E E D I N G S

 4                           ~ ~ ~

 5              COURT CLERK:  Item 3.  10-CV-5636DMG.  Garbis

 6    Davoyan, et al, versus Republic of Turkey, et al.

 7                    Item No. 4.  Alex Bakalian, et al, versus

 8    Republic of Turkey, et al.

 9                    Counsel, please state your appearances.

10              MR. GERAGOS:  Good morning, Your Honor.  Mark

11    Geragos, G-E-R-A-G-O-S, for plaintiffs, Davoyan; and Shelley

12    Kaufman from Geragos & Geragos for Plaintiff Davoyan.

13              THE COURT:  Good morning.

14              MR. MALZAHN:  Good morning, Your Honor.  Scott

15    Malzahn with Kabateck Brown and Kellner for the plaintiffs in

16    the Davoyan action.

17              MS. CRAWFORD BOYD:  Lee Crawford Boyd for the

18    Plaintiff in the Bakalian action.

19              MR. SOLTMAN:  Good morning, Your Honor.  Neil

20    Soltman of Mayer Brown, LLP, for the defendants in both

21    actions, for the moving defendants.

22              MR. MARMOLEJO:  Matthew Marmolejo of Mayer Brown,

23    LLP, for defendants as well, in both actions.

24              MR. SALTZMAN:  David Saltzman for defendants in

25    both actions.
```

1             THE COURT:  All right, good morning, counsel.

2             I don't have a tentative for you, but I would

3     like counsel to focus this morning's argument on the issue of

4     *subject-matter jurisdiction*.  All right?

5             MR. SOLTMAN:  Good morning, Your Honor.

6             I think this is, actually, in the FSIA

7     context a fairly straightforward case.  Both plaintiffs, both

8     cases assert the *expropriations* exception to the FSIA grant

9     of immunity, and obviously the standard rule -- and I don't

10    think there is any dispute here -- that the bank defendants

11    are instrumentalities or alleged instrumentalities of the

12    Republic of Turkey, and they are presumptively immune unless

13    a specific exception applies.

14            In the *Davoyan* case, the only exception

15    alleged is the *expropriation* exception, although they raise

16    the *commercial* exception in their Opposition papers, and we

17    responded to it there, but it's not in their pleading.  In

18    *Bakalian*, they raise both the *expropriation* exception and the

19    *commercial activity* exception.

20            And I think, you know, it is not often that

21    we have a recent case from the en banc Ninth Circuit that

22    seems to answer it and answers it in the way that seems to be

23    quite offhanded; that is, accepts the proposition that the

24    *expropriations* exception does not apply when the alleged

25    expropriation is between a foreign nation and the citizens of

UNITED STATES DISTRICT COURT

 1    that nation, and that that was up there in the *Cassirer* case

 2    and seemed, you know, undebatable question in that case, and

 3    there's a series of cases.  Before that the Supreme Court --

 4    two of the Supreme Court justices referred to as "the

 5    consensus view of the lower courts."  The Ninth Circuit view

 6    has been that way since 1990, and obviously there is an

 7    allegation here that the underlying expropriation, and that's

 8    what's referred to, that is it isn't -- as *Cassirer* tells

 9    us -- it isn't the citizenship of the plaintiff; it is the

10    citizenship of the party or the nonparty whose property was

11    expropriated that matters.

12              There's allegations in both cases that the

13    persons whose property was expropriated were citizens of the

14    Ottoman Empire at the time of the expropriation, and the

15    *Chuidian* case and a series of cases leading up to *Cassirer*

16    all say that ends the question with regard to *expropriation*

17    that the FSIA does not take into account, certainly in the

18    Ninth Circuit, does not take into account or does not permit

19    jurisdiction over cases in which the expropriation is alleged

20    with regard to a citizen or a national of the country that

21    allegedly did the expropriation.

22              THE COURT:  How do you respond to the plaintiffs'

23    argument that either, one, that it wasn't necessary to the

24    *Cassirer* decision or that there should be some sort of an

25    exception because this is an allegation of genocide?

1           MR. SOLTMAN:  Well, taking the second issue first,

2    foreign sovereign immunity cases often come up in unusual

3    circumstances.  Congress knows how to draft the statute.

4    There were genocide allegations before the FSIA was passed in

5    1976.  If Congress wanted to have an exception for the

6    particular kind of appropriation -- expropriation, then

7    Congress could have put in an exception for the particular

8    kind of expropriation.  But there are, really, I think, two

9    issues here:  One, in the case of the *Bakalian* plaintiffs,

10   they told you this was not anything other than a

11   garden-variety real estate case.

12           Now, whether it's a garden-variety real

13   estate case or not, I don't think really is the issue.  The

14   issue is, it is not a genocide case.  It is a case in which

15   two bank defendants are alleged to be the recipients of

16   property that was allegedly unlawfully given to them.  That's

17   exactly the same argument that comes up in *Cassirer*, which

18   is:  You are, essentially, the recipient of stolen property

19   or the provenance of the property gives you reason to believe

20   that perhaps title wasn't good, because at some point title

21   was not good.

22           That's what happened in, for example, the *Von*

23   *Saher* case, too, in the Ninth Circuit, same issue, when the

24   Nazis expropriated the art, there's all of a sudden a title

25   defect, and whoever is holding it now is subject to the claim

1    of the title defect.

2              There is no allegation that the *expropriation*

3    was by the banks.  The allegation -- and there is no

4    allegation that says the banks were participants in the

5    underlying allegation of genocide.  This is what flows

6    through as a result, just as it did -- as a result of a war

7    or a conflict, just as it did in *Cassirer*, just as it did in

8    *Von Saher*.

9              So, in each of those cases, the question is:

10   Is there something special because of the underlying

11   circumstances?  And if there were something special, Congress

12   could have written it in.  But Congress is talking about --

13   there is an *expropriation* exception but not for, as the cases

14   have developed, not for the citizens of the entire -- of the

15   country which is alleged to have done the expropriation.

16             And I don't see that there is any exception

17   to that.  I don't -- there is no case that says:  If the

18   underlying circumstances of the expropriation

19   are particularly unpleasant, that the *expropriation* exception

20   is somehow different.  *Expropriations* always come from

21   unpleasant underlying circumstances.

22             The question of whether that was a necessary

23   issue in *Cassirer* -- well, in *Cassirer*, remember, the Court

24   goes off on, says, it doesn't apply in that case because the

25   German national whose painting was taken was a Jew, and the

1  expropriation occurred after the Nazis declared Jews to be

2  noncitizens.

3          So, the Court says:  Well, we'll take it from

4  the expropriating country.  They say these people are

5  noncitizens; then, they are noncitizens.  And now you don't

6  fall within the exception that says:  You're taking it from

7  your citizens because the expropriator declared that they are

8  not.

9          Here, on the other hand, the allegation is

10 that the people whose property was taken were citizens of the

11 Ottoman Empire, and we quote in our papers the applicable

12 citizenship statute at the time that shows that unless you

13 were not, and you could -- unless the citizen, or supposed

14 citizen, could prove that he or she was not a citizen, the

15 assumption is, if you were a resident within the Ottoman

16 Empire, you were a citizen of the Ottoman Empire.  And that,

17 I think --

18         THE COURT:  Does it make any difference under the

19 Factual Allegations that the so-called "Young Turks" were

20 trying to deport Armenians and to relocate them away from the

21 Ottoman Empire?

22         MR. SOLTMAN:  Makes no difference whatsoever.  The

23 circumstances of the expropriation make no difference

24 whatsoever, particularly when you're talking about a

25 defendant who's -- as to whom the allegation is that they

1    received the property after the expropriation, that they were

2    not part of the expropriating entity, that they were not

3    participating in the expropriation.

4                    Even if they were, I don't think would make a

5    difference.  But the allegations, whatever the circumstances

6    are, the rule appears to be, and the Ninth Circuit has

7    adopted it and the Supreme Court, several justices have said

8    that's the least of consensus, you have not disagreed with

9    it, that the underlying circumstances are irrelevant.

10                    It's a very simple question.  If the person

11   whose property was taken was a citizen of the nation that

12   allegedly took the property, it is not within the

13   *expropriation* exception to the Foreign Sovereign Immunities

14   Act.  There may be other claims, there may be other issues,

15   there may be other arguments, but that's what the statute

16   says, and Congress is entitled to draw those lines, which it

17   did draw.  And in the years, the many years since the statue

18   was passed and these cases developed, Congress hasn't seen

19   fit to come back and say:  We need to have another *exception*

20   here, whatever that *exception* may be.

21                    THE COURT:  No, I understand there is not an

22   exception.  What I was asking was different, and that is:  Is

23   there any factual allegation in this case that the people

24   from whom property was expropriated may be tantamount to

25   noncitizens by the fact that they were being deported?  Why

```
 1     would they be deported if they were lawful citizens?
 2               MR. SOLTMAN:  Well, they were -- the allegation is
 3     that they were citizens of the Ottoman Empire.  The
 4     applicable statute of the Ottoman Empire made them citizens.
 5     There is no allegation that a particular person was deported
 6     or not or when the property was taken compared to the time of
 7     the alleged deportation.
 8               The fact that you are deported may or may
 9     not, under Turkish law, have anything to do with whether
10     you're a citizen.  The fact is that Congress didn't build
11     that exception in, and the case law doesn't build that
12     exception.  In Cassirer the answer is, that he was not a
13     citizen because the nation declared that he was not a
14     citizen.  There is no such declaration here.
15               The argument that:  If somebody is allegedly
16     being deported, then they are ipso facto not a citizen really
17     gets into a question of Turkish law, which is, I think,
18     completely not appropriate here because we're dealing with
19     American law, and the American law does not have an exception
20     for people who were being deported even though they were
21     citizens and were alleged to be citizens of the expropriating
22     entity.  And that doesn't get to the question at all of:
23     These are not people -- the defendants are not people who are
24     alleged to have been involved in the expropriation.  Period.
25               And that is a bright line distinction.  You
```

1    cannot -- just as you cannot attribute to, for example, the

2    Northern Simon Museum in the *Von Saher* case or the foundation

3    in the *Cassirer* case, just as you cannot attribute to the

4    possessor of the property -- and we're assuming here that the

5    banks possessed the property.  I think that's a wholly

6    different issue and one that would be in great dispute.

7                    But in the *foundations* case, in the *Cassirer*

8    situation, nobody is trying to attribute to the foundation

9    which possesses the property the acts of the Nazi government

10   that expropriated the property.

11                  THE COURT:  So, assuming that there were some sort

12   of declaration from the Turkish government that these

13   individuals were noncitizens or that they were tantamount to

14   be noncitizens, are you saying that that still would not

15   affect the bank's liability, but it may affect the Republic

16   of Turkey's liability?

17                  MR. SOLTMAN:  I don't think it would affect the

18   bank's liability at all.  That's correct.  Whether it affects

19   the Republic of Turkey's liability is another issue that I

20   haven't looked into, and I'm really not in a position to say

21   one way or the other because we haven't researched it.  We've

22   researched obviously the issues that relate to the banks,

23   themselves, and I think the Ninth Circuit tells us what the

24   answer to that is, whether it does so expressly or by clear

25   implication over a series of years it does.

1            The *commercial activity* exception -- and if

2    the Court has more questions on *expropriation*, I'm happy to

3    answer them.

4            THE COURT:  No.

5            MR. SOLTMAN:  The commercial activity exception,

6    really, relates to two different issues.  As I said, one of

7    the cases has it alleged, one does not.  The well-established

8    law appears to be both in the Ninth Circuit and the Second

9    and the Fifth Circuit as well, that if you allege an

10   *expropriation* exception, you cannot also allege a *commercial*

11   *activity* exception.

12           It appears to be based on a concern that

13   everything will just be sort of flipped on its head and that

14   basically it's an election of remedies under the case law.

15   It says:  If you pick A, you can't pick A and B.  Doesn't

16   say:  If you pick B, that you can't B by itself, but you can

17   pick both of them and try to flip one into the other.  If one

18   doesn't work, then the other one doesn't work.

19           And here we are, I think, in a situation

20   which is clear that they both argue *expropriation*.  I think

21   the *Davoyan* Complaint acknowledges, implicitly

22   acknowledges -- although I think there was a, sort of,

23   cutback on that in the Opposition papers, but implicitly

24   acknowledges the argument that you can't pick both, and so it

25   didn't allege *commercial activity* along with *expropriation*.

1    I think that's obviously the appropriate petition.

2                    The position now appears to be somewhat

3    different, but the law isn't any different.  But this has

4    been the law for a period of time, and that's a, I think, the

5    policy choice that the courts have made and Congress has not

6    seen fit to disturb.

7                    But if you look at the issue with regard to

8    *commercial activity*, even assuming it's an appropriate issue

9    to look at, I don't -- it doesn't fit in any of the

10   particular circumstances.  You know, one question is, was

11   there any activity in the United States relating to this?

12   The answer is:  Obviously not.  So, that subcategory, that

13   first subcategory of the *commercial activity* exception goes.

14                   Another exception to the *exception* is whether

15   the property that's involved is, that was involved in such a

16   way as private property as opposed to sovereign activity.

17                   In the *Bakalian* case, obviously the property

18   is property which is now part of an American airforce base or

19   an airforce base in Turkey leased to America, the United

20   States' position is that -- the United States obviously is

21   the lessee of that property.  Turkey obviously leased it to

22   the United States with regard to operating a military base.

23   That is clearly a sovereign activity.  It clearly has nothing

24   to do with any commercial activity.

25                   And there isn't any serious argument that

```
 1    anything that occurred with regard to the property from its

 2    expropriation or from its taking in Turkey had any effect on

 3    the American economy.  In fact, the only allegation appears

 4    to be that you can find the defendants in the United States,

 5    and -- but that is enough.  There is no allegation that

 6    whatever property was taken -- obviously with regard to the

 7    Bakalian property, that's real property.  There is nothing

 8    one can do with it in the United States.

 9               It's unclear what the property is in the

10    Davoyan case, but it's clear that there is no allegation that

11    that property was taken shifted to the United States, used in

12    any way to affect the United States economy.

13               So, even if you could get to the commercial

14    activity exception, and I don't think you can in either of

15    the cases, they clearly do not fit here.

16               This is -- when all is said and done, this is

17    an expropriation case.  That's really what the basic

18    allegation is, that property was taken in the period of 1915

19    to 1923 when the Ottoman Empire was crumbling or after it had

20    crumbled but before there was a Republic of Turkey; and that

21    those -- that was really the crux of the allegation here,

22    which is:  We put everything else aside.  That's what it is.

23    The property was taken and was eventually transferred in some

24    form or way to the banks.

25               It's unclear how that was done or when that
```

```
 1    was done or what evidence there is that that was done.  But
 2    taking those allegations as they exist, that puts it right in
 3    the situation of the Cassirer case and other expropriation
 4    cases, which is:  Whoever winds up with the property at the
 5    end of the day is not necessarily the person who was involved
 6    in the expropriation at the beginning, and Congress has seen
 7    fit to draw that line and to not upset that line after
 8    decades of cases coming out the other way.
 9              THE COURT:  All right, thank you, Mr. Soltman.
10              MR. SOLTMAN:  Thank you.
11              THE COURT:  I will give you a few minutes for
12    rebuttal.
13              MR. SOLTMAN:  Thank you very much.
14              MR. GERAGOS:  Thank you, Your Honor.  Mark Geragos
15    for Davoyan.
16                   If I could address the questions that the
17    Court was asking specifically.
18              THE COURT:  Yes.
19              MR. GERAGOS:  We've put in the allegations of the
20    Complaint specifically all of the details, and when the Court
21    asks:  How do you deport a citizen?  Or:  Why would you
22    deport somebody who's a citizen?  Clearly, what we have
23    alleged in the Complaint and what the factual underpinnings
24    for that is, that these people were not citizens, the
25    Armenians were not a citizen.  You can't even classify them
```

```
 1    as a second-class citizen.  So --

 2              THE COURT:  But was there any allegation of an

 3    official declaration from the Ottoman Empire as opposed to,

 4    let's say, unlawful conduct?

 5              MR. GERAGOS:  We could actually -- there is.  I

 6    don't think that it's contained within the Complaint, but I

 7    believe that there is, both a 1920 and a 1927 pronouncement

 8    showing, in fact, that the Ottoman Empire did not consider

 9    the ethnic Armenians to be citizens.

10              There's also allegations that the Armenians

11    had both Syrian and other -- or than Ottoman Empire

12    citizenship.  If that's the case, and one of the things that

13    the Court, as you well know, can order is, that if they're

14    proceeding by way of -- and what the defense is asking you to

15    do here is to proceed by way of their declarations, the Court

16    can order either limited, discrete pretrial discovery or an

17    evidentiary hearing in which we can present to the Court the

18    agreements and other items that show clearly that there is

19    not -- you're not dealing with a situation here where these

20    are people who were Ottoman -- necessarily Ottoman citizens.

21    In fact --

22              THE COURT:  Are you suggesting that there be

23    limited discovery for subject-matter jurisdiction purposes

24    because you don't know yourself whether they were, in fact,

25    citizens?  Or are you asserting that discovery will show that
```

```
 1    they were not?
 2                MR. GERAGOS:  I think that discovery would show
 3    that they were not and to give you an answer to your question
 4    in terms of the treatise that were applicable that would show
 5    that Armenians were not considered to be -- ethnic Armenians
 6    were not considered to be citizens for purposes of
 7    subject-matter jurisdiction.
 8                     If that is shown, and the question -- the
 9    answer to the question is:  Why would you be deporting your
10    own citizens?  You can show -- the answer to that question is
11    embodied in the treatise and the proclamations from the
12    Ottoman Empire.  That can then show clearly that this falls
13    within the subject-matter jurisdiction of the federal
14    district court.
15                THE COURT:  Is this true of both the *Bakalian* and
16    the *Davoyan* cases?
17                MR. GERAGOS:  I don't want to speak for *Bakalian*.
18                MS. CRAWFORD BOYD:  If the question is, is this
19    true, we are going on the theory of citizenship?
20                THE COURT:  Or noncitizenship.
21                MS. CRAWFORD BOYD:  Or noncitizenship?  Your
22    Honor, we are -- we don't oppose jurisdictional discovery,
23    but we are not requesting it because our theory is based on
24    violation of international law under A3 and A2, specifically
25    being that takings during the perpetration of the genocide is
```

```
1    a violation of international law within the scope of the
2    terms of the FSIA A3.  So, if --
3              THE COURT:  If that --
4              MS. CRAWFORD BOYD:  -- we don't request.
5              THE COURT:  If that is your position, though, how
6    is this court to avoid the Cassirer decision which
7    specifically says that citizenship matters because we have
8    held that the takings exception at issue here does not apply
9    when a plaintiff is a citizen of the country that
10   expropriates his property?
11             MS. CRAWFORD BOYD:  Two reasons:  No. 1, that
12   question was not before the Ninth Circuit in Cassirer or in
13   any other case.  The question of a taking in perpetration of
14   genocide has never been before the Court even in Chuidian --
15   Churidian -- I'm not sure how to pronounce that, Your Honor,
16   or the Siderman case.  The question of a "taking during the
17   perpetration of genocide" has never been considered by the
18   Ninth Circuit.
19             Takings from noncitizens during -- in other
20   circumstances have been considered, and under international
21   law, it is a true statement.
22             These are not irreconcilable cases.  And
23   Chuidian -- Chudian -- again, I'm not positive how to
24   pronounce that -- the question was:  Spain was being brought
25   in under the jurisdiction of the FSIA, but the taking was by
```

1    the Nazi -- the Germans.

2                     So, and that case was not this case.  There

3    was not -- genocide by Spain was not before the Court.  It

4    fit well within the traditional concept that a taking from

5    non-nationals -- it does not violate international law.  But

6    it did not visit this question, which is a question of *first*

7    *impression* for this Court, and it has not been determined by

8    the Ninth Circuit.

9                     Although, the Ninth Circuit has determined,

10   and in particular, the *Sarei* case, versus *Rio Tinto*, recently

11   en banc, October 25th, 2011, in which the Ninth Circuit

12   agreed and held that *genocide* is a violation of international

13   law.

14                     And, indeed, even at the time of these

15   takings, the allies during World War I had adjudged that the

16   taking during the genocide of the Armenian property [SIC] was

17   a violation of international law.  And we have put forward in

18   expert declarations by historians and our law professor that

19   the state of the law was well settled even at that time that

20   takings during a genocide -- and I do direct the Court's

21   attention to the Genocide Convention, itself, which sets

22   forth that one of the means by which a people are wiped out

23   is making conditions of life non-livable, including taking of

24   property.

25                     So, this was a violation of international law

1    at the time; it was a violation of international law in 1976

2    when the FSIA was passed.  And, again, Congress did not put

3    out any specific violations of international law.  They did

4    not set out any specifics.  They said all violations of

5    international law, "takings" will be held to be an exception.

6              And this case -- this particular fact pattern

7    has never been before the Court.  It wasn't in *Siderman*, it

8    wasn't in *Cassirer* or *Chuidian*.

9              THE COURT:  Well, I think that's a very

10   interesting theory, and perhaps you may be able to convince

11   the Ninth Circuit of that.  But I think this court is bound

12   by the Ninth Circuit, and it has said very clearly, I think,

13   in the case law that the "*takings*" exception does not apply

14   when a foreign state takes the property of its own citizens.

15   So --

16             MS. CRAWFORD BOYD:  Respectfully, Your Honor, only

17   in context that don't include genocide or crimes against

18   humanity has that been the holding of the Ninth Circuit.

19             So, contrary to position of the defense that

20   this is binding Ninth Circuit law, I would direct the Court's

21   attention to the actual cases never before has it determined

22   this particular question, which is "the taking during the

23   commission of a crime against humanity" does not fall within

24   the A3 exception.  Never has that been held by the Ninth

25   Circuit.

```
 1              For that reason, we are relying on that as
 2    well as A2, which I'll address, but I don't want to -- if
 3    there is any more questions from Mr. Geragos on this issue of
 4    citizenship --
 5              We did allege in our Complaint as well that
 6    these were treated -- that these Armenians were treated as
 7    non-citizens, de facto non-citizens, in the same way the Jews
 8    of the Third Reich were considered non-citizens in the final
 9    solution.  In that same way were these individuals in a
10    stateless position at the time of World War I and, as you
11    say, being deported.  So we have relied also on that theory,
12    Although we're not requesting jurisdiction --
13              THE COURT:  So, if you're not requesting
14    jurisdictional discovery but Mr. Geragos is, are you standing
15    on your Complaint?
16              MS. CRAWFORD BOYD:  We will stand on the
17    allegations of our Complaints.  We will not oppose
18    jurisdictional discovery to the extent that these cases are
19    moving in tandem on the question of foreign sovereign
20    immunity, and I believe that they are, while they may diverge
21    on the merits, I believe they are in a position of a related
22    case now and should proceed in tandem.  We would want to be a
23    part of that jurisdictional discovery.
24              THE COURT:  All right, Mr. Geragos, how do you
25    respond to Mr. Soltman's position that the banks would not be
```

1    subject to this exception in any event?

2            MR. GERAGOS:  Well, we've alleged exactly -- and I

3    think in the Opposition specified exactly why the banks --

4    there was a taking, there was a commingling of the assets,

5    there was a trust, and these properties were to be held and

6    the proceeds from the properties were to be held.  So, you

7    can't have it both ways.

8            I think that one of the things that I also

9    believe can be kind of fleshed out, if you will, in

10   jurisdictional discovery, is precisely addressing that point.

11           I am requesting that jurisdictional

12   discovery -- and also there may be the additional request as

13   the Court has the authority to allow an evidentiary hearing,

14   and I, depending on the outcome of the jurisdictional

15   discovery would request an evidentiary hearing as well,

16   because I believe precisely the questions that the Court

17   started with Mr. Soltman are exactly what I think the issue

18   is in this case in terms of subject-matter jurisdiction.

19           It's not just a de jure or a de facto.  It's

20   a de jure, and I believe that the jurisdictional discovery

21   can show both that it was de facto, that they were treated as

22   other than citizens by the deportations.  And I think it's de

23   jure in the sense that there are treatise that show and

24   proclaim precisely that it is not.  And then when it comes to

25   the banks, that the banks were -- are claiming that they're

```
 1   cloaked with this immunity at the same time that they were

 2   parties to.

 3                When he gets up here and makes the kind of

 4   factual statement, so to speak, that the banks and -- was

 5   arguing similar to the Von Saher case, that we didn't know

 6   about the provenance, I think all of those things can be laid

 7   to rest from jurisdictional discovery.  So, that's precisely

 8   why I would request that, because they've taken these kinds

 9   of positions that I believe would be belied by simple

10   discovery requests and production of discovery.

11          THE COURT:  Are you asserting that the individuals

12   who were the owners of this property for whom the plaintiffs

13   are the successors-in-interest, people who were subject to

14   these deportation orders?

15          MR. GERAGOS:  Yes.  I think that the -- yes, we

16   are.  And I think that the -- ours is filed as a class

17   action, and as members of the class, I often joke that

18   Armenians are all connected by three degrees of separation.

19   You can't put three Armenians in a room and not find five

20   interconnections.

21                The large majority of all Armenians who were

22   residing in Ottoman Turkey, almost everyone who has their

23   close, intimate, nuclear family was driven out of that

24   country or massacred in the country; and so, I don't think

25   that it would be difficult at all during jurisdictional
```

1   discovery to show that that is the case, number one, and that

2   the class that they're representing is -- it permeates the

3   class that they're representing.

4          THE COURT:  Assuming that I do allow

5   jurisdictional discovery, how do you get over the time bar?

6          MR. GERAGOS:  Well, the -- our theory on the

7   *constructive trust* is that there is continuing violation.

8   Our theory here is, is that all of the proceeds that were

9   taken and misappropriated or expropriated were immediately

10  held in trust; and then, once again, that is based upon the

11  laws that were in effect then and then reiterated once again

12  by the ROT, then the money is still commingled once you're

13  here in the US and that that's a continuing violation which

14  takes you out of the *statute of limitations* issue.  I could

15  go in -- and that's just the, kind of the common law

16  practice.

17          There is also the analysis that we did along

18  with these statutes.  And the statutes -- under California

19  statutes is, that if you're asking for a bank deposit, that's

20  a continuing violation that takes you out of any kind of

21  *statute of limitations* issue.

22          THE COURT:  And would give rise to more than a

23  hundred years of tolling?

24          MR. GERAGOS:  As long as they're keeping, holding

25  on to the assets, yes, that's the way that it works.

```
 1              If I steal the object from somebody else,

 2   hold on to that object for a period of time, and then based

 3   upon the circumstances -- and, remember, those become factual

 4   determinations as to discovery and things of that nature, but

 5   for purposes of a 12(b) motion for what we're here for, as

 6   the Court knows -- and I'm not going to reiterate it -- but

 7   the fact is, is that you take the allegations in the

 8   Complaint as true, and based upon the allegations in the

 9   Complaint, there isn't a statute of limitations issue that I

10   perceive at this point.  They may raise that at some other

11   point, but it isn't for, I don't think, precisely within the

12   12(b); and I think that there is the -- if you want or --

13              THE COURT:  Well, the limitations period is

14   traditionally the subject of 12(b)(6) motions unless there's

15   allegations of equitable tolling.

16              MR. GERAGOS:  And that's precisely what we're here

17   saying.

18              THE COURT:  Is the underlying property all real

19   property, or are there other kinds of properties?

20              MR. GERAGOS:  No, it's a mixed bag under the

21   factual underpinnings for the Complaint.  And the reality of

22   it is, is that not only was real property taken or property

23   deeds, cash was taken, diamonds were taken, gold was taken,

24   all kinds of items that were then deposited with the banks as

25   well.  There was also rents and things of that nature, any
```

1    kinds of products from the real property in terms of crops

2    and things like that, which were then formed or turned into

3    moneys which were then deposited in the banks.  So, the banks

4    had and were in possession of a variety of instruments and

5    proceeds that were other than real property.

6                THE COURT:  All right.  Thank you.

7                MR. GERAGOS:  Thank you, Your Honor.

8                MS. CRAWFORD BOYD:  If I can just add a couple of

9    points for the *Bakalian* case.  It deals only with actual real

10   property of which the deeds were attached to the Complaint.

11   So, in that sense we diverge from *Davoyan*.

12                Also, just to respond to the point made by

13   the banks that the banks, themselves, were not perpetrators

14   of the *taking*.  First, the allegations in the Complaint defy

15   that; and, secondly, there is no requirement under the FSIA

16   that the jurisdictional -- the person or entity being held to

17   the jurisdiction under the FSIA be the perpetrator of the

18   *taking*, merely that the property in issue was -- there was a

19   *taking* in violation of international law.  Doesn't have to be

20   the same person --

21                THE COURT:  Given that your case involves real

22   property, were the banks still holding the property in trust

23   through the present?

24                MS. CRAWFORD BOYD:  The profits from the property,

25   they are continuing to benefit from, yes, the use of that

```
1    property and profits therefrom.  And, of course, we have sued
2    the Republic of Turkey which is now in default on the trust
3    theory, Your Honor.  So -- on that note.
4                    As far as the statute of limitations, just to
5    add to Mr. Geragos' points, the defendants have not addressed
6    the choice of law issue; and, again, a case not cited, and I
7    do have copies, is the Cruz versus United States case in the
8    Northern District of Illinois, which is an FSIA case and
9    makes the point that with statute of limitations -- and,
10   again, the Ninth Circuit has said this in the Schoenberg
11   case, federal common law applies.  And under federal common
12   law, restatement, Section 142:  Exceptional circumstances and
13   equitable tolling and continued violation are the rules that
14   are applied under federal common law.  And the Complaints
15   have -- our Complaint, the Bakalian Complaint, has fully set
16   out both equitable tolling, continuing violation doctrine,
17   which is a federal common law doctrine, as well as the
18   exceptional circumstances of expropriation during a genocide.
19   And under those theories, in federal common law theories, we
20   have sufficiently pled the statute of limitations under the
21   Iqbal standard.
22                 THE COURT:  All right, thank you.
23                    Mr. Soltman, you have five minutes.
24                 MR. SOLTMAN:  Thank you, Your Honor.
25                    First, I think we could focus on what is
```

```
 1    actually alleged, a few paragraphs -- for example in the
 2    Bakalian case, paragraphs 4 and 5 of the Complaint, describe
 3    their ancestors, plaintiffs' ancestors as Turkish-Armenians,
 4    and allege in paragraph 11, quote:  "The taking of a property
 5    of a state's own nationals," closed quote, is involved here.
 6              So, there is an affirmative allegation that
 7    these were citizens of the Ottoman Empire at the time of the
 8    taking.
 9              Two, the deportation is --
10         THE COURT:  Before you move on, what do you say to
11    Mr. Geragos' proposal that he be allowed jurisdictional
12    discovery?  Since this is a 12(b)(6) motion, he may be
13    granted leave to amend if he wishes to amend and say that his
14    clients were not -- or not his client but his clients'
15    predecessors were not, in fact, citizens.
16         MR. SOLTMAN:  Well, that's something that
17    presumably Mr. Geragos and his clients know.  They don't need
18    jurisdictional discovery to figure out whether their
19    ancestors were or were not citizens, and I'll get to that as
20    a matter of law in a second.  And if the Court grants them
21    leave to amend, I don't think that would be appropriate in an
22    FSIA case because its subject-matter jurisdiction, and I
23    don't think there's anything here that really gets to that.
24              But if that were so, if they think they can
25    allege to that consistent with Rule 11, then they would
```

```
1    allege to that consistent with Rule 11.  But they're not
2    going to find that out by taking jurisdictional discovery.
3    They should presumably know these people.  They are making
4    all kinds of allegations:  What property they had, where they
5    went, where they were, when they came.  We don't have any of
6    that.  We don't even know, necessarily, who they are; but
7    that's something they ought to be able to allege, themselves.
8    There is no need for jurisdictional discovery for that issue.
9           The argument that *Cassirer* wasn't a requirement or
10   wasn't a part of the holding in *Cassirer*, all you have to
11   look at is at page 1023.  The Court talks about in 1939, the
12   owner decided that she had to leave Germany, that at that
13   time, by that time, that the Jews had already been considered
14   non-citizens of Germany.  And then the Court drops a
15   footnote, Footnote 2, and Judge Rymer says:  "Citizenship
16   matters, because we have held that the *takings* exception at
17   issue here does not apply where the plaintiff is a citizen of
18   the country that expropriates his property.  Citing *Chuidian*
19   *versus Philippine National Bank*.
20          It is clearly -- the Court tells us that it's
21   in issue here --
22          THE COURT:  I think I quoted that, too.
23          MR. SOLTMAN:  Yes.  Another thing I wanted to
24   point out is, the statute -- and there's no argument about
25   this in the Opposition papers.  We cited on page 5 of both
```

1    opening motion papers, the Ottoman nationality law in effect

2    between 1915 and 1923.  It's attached to the *Murphy*

3    *Declaration*, and it provides that:  "*Every person inhabiting*

4    *the Imperial Dominions*," broad term, *Imperial Dominions, "is*

5    *considered as an Ottoman subject and treated as an Ottoman*

6    *subject.  If he (or she) is a foreign subject, it is*

7    *necessary for him (or her) to prove it in a regular manner.*"

8                So, there is a statute in effect at the time

9    that says every person who is inhabiting anywhere within the

10   Imperial Ottoman Empire is a subject of the Imperial Ottoman

11   Empire and treated as such.  If there is some exception to

12   that, it's not clear what it is.

13               The related point to that is, that

14   "deportation" is being used fairly loosely here; that is, I

15   think, historically, their *deportations* were not actually

16   *deportations* from the Ottoman Empire.  There was movement of

17   people between Ottoman Turkey and Ottoman Armenia.  But

18   that's not the same as deportation with the Ottoman Empire,

19   obviously was quite, quite broad.  And to say that they were

20   deported from the Ottoman Empire, I don't think there is any

21   allegation of that which is really all that it takes for this

22   purpose, and I don't think there is any factual issue to

23   that.

24               "Deportation" is, really, a question of

25   movement as opposed to what they call "deportation," but

```
 1    nobody else calls it that, and they don't even call it that
 2    in their own pleadings.
 3                    With regard to the time bar, look, when we
 4    get -- it is obvious that there is a time problem here.  It
 5    is obvious that no matter what status, between 1915 or 1923
 6    or 1925 or 1930, we have another 70 years.  And the statute
 7    that Mr. Geragos so quickly said:  Oh, well, that's what the
 8    bank deposit statute said, two things:  These are not bank
 9    deposits.  Most of them are real property; others are things
10    that they allege are not bank deposits.  But Judge Morrow
11    declared that statute to be unconstitutional.  And in the
12    Deirmenjian case, that case is up on -- at circuit now.  It's
13    fully briefed.  It's waiting for an argument date.  But in
14    this district, at least, that statute is unconstitutional.
15                    There is no basis other than that, other than
16    this theory of equitable tolling that goes on for decades and
17    decades and decades, and there is no possible allegation here
18    why between 1930 or 1940 or pick any time that there is a
19    tolling even though people, obviously, decades later, knew of
20    what was going on and only bring the lawsuit after the Year
21    2000 when there were some statutes, and after 354.4, its
22    constitutionality is before the en banc Ninth Circuit now on
23    insurance policy, but it's, for some reason, cited in the
24    Davoyan papers or 340 -- 354.45, relating to bank deposits,
25    which has already been declared unconstitutional.
```

1          Judge Morrow's decision in *Deirmenjian* threw

2    out the claims both on statute of limitations grounds as well

3    as other grounds that as we've alleged under the Ankara

4    Agreement under foreign affairs preemption, under a whole

5    variety of theories which obviously I think the Court doesn't

6    want to get into in detail today, but none of the -- the

7    theory that there is a tolling for 70 years after the events

8    have cleared is really not one that was able to make its way

9    into the complaints based on Rule 11, and there is no

10   specific allegation of why it is that that would occur.

11          If you look at, for example, in the *Deutsche*

12   case, the Ninth Circuit opinion, there, which talks about the

13   statute of limitations issues in the context of holocaust

14   victims and -- holocaust victims as well as World War II

15   slave victims in Europe and in Asia, Judge Reinhardt's

16   analysis goes through and says:  There is no saving of these

17   claims from the statute of limitations once the particular

18   statute which extended the statute to 2010 in that case was

19   declared unconstitutional by the panel.

20          Since the same -- the only applicable,

21   reasonably applicable statute is 354.45, that's been declared

22   unconstitutional I think at least for the purposes of this

23   district, there's nothing --

24          THE COURT:  Well, actually, Judge Morrow's

25   decision may be persuasive on this court, but it is not

1   binding on any of the judges in this district.

2           MR. SOLTMAN:  Yes, it may not be binding, but I

3   think we all know it's relatively rare for one judge to,

4   without very good reason, distinguish a case that is

5   otherwise on all fours from another judge who's worked on it

6   for a number of years.  So, I think it is in the category of

7   it being highly, highly persuasive although not absolutely,

8   absolutely binding.

9           THE COURT:  All right, thank you, Mr. Soltman.

10          MR. SOLTMAN:  Thank you.

11          THE COURT:  Did you have anything further?

12          MR. GERAGOS:  Just as to the *Deirmenjian* case.  As

13  the Court has already said, obviously it would be persuasive

14  if it wasn't on all fours.  I argued that case before Judge

15  Morrow.  I would submit to this Court that there are major

16  distinctions, and it is not on -- it's not even on all twos

17  as opposed to all fours.  So, I would reserve that or ask the

18  Court to reserve that for the appropriate time.

19          THE COURT:  All right, thank you.

20          MS. CRAWFORD BOYD:  Just a closing remark, that it

21  is our position that citizenship does matter, and it is also

22  our position that international law has long recognized that

23  a taking of one's own citizen's property by a state in a

24  perpetration of genocide is a violation of international law

25  and therefore *jurisdiction* is appropriate under Section A3 as

1    well as A2, although we didn't discuss that.

2              THE COURT:  All right.  Thank you.

3                   I appreciate the parties' briefing on this

4    matters, and the matter will stand submitted.

5              (Court adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2     I hereby certify that the foregoing is a true and correct

3     transcript of the stenographically recorded proceedings in

4     the above matter.

5     Fees charged for this transcript, less any circuit fee

6     reduction and/or deposit, are in conformance with the

7     regulations of the judicial conference of the United States.

8

9

10    /S/Anne Kielwasser                   01/04/2012

11    _____     _____
      Anne Kielwasser, CSR, RPR         Date
      Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**/**

**/S/Anne** [1] - 36:10

**0**

**01/04/2012** [1] - 36:10

**1**

**1** [1] - 19:11
**10-CV-05636** [1] - 1:11
**10-CV-5636DMG** [1] - 4:5
**1023** [1] - 30:11
**10:00** [1] - 4:1
**11** [4] - 29:4, 29:25, 30:1, 33:9
**12(b** [2] - 26:5, 26:12
**12(b)(6** [2] - 26:14, 29:12
**142** [1] - 28:12
**19** [2] - 1:18, 4:1
**1915** [3] - 15:18, 31:2, 32:5
**1920** [1] - 17:7
**1923** [3] - 15:19, 31:2, 32:5
**1925** [1] - 32:6
**1927** [1] - 17:7
**1930** [2] - 32:6, 32:18
**1939** [1] - 30:11
**1940** [1] - 32:18
**1976** [2] - 7:5, 21:1
**1990** [1] - 6:6

**2**

**2** [1] - 30:15
**2000** [1] - 32:21
**20005** [1] - 3:6
**2010** [1] - 33:18
**2011** [3] - 1:18, 4:1, 20:11
**202-637-9876** [1] - 3:7
**202-637-9877** [1] - 3:6
**213** [1] - 1:24
**213-217-5000** [1] - 2:10
**213-217-5010** [1] - 2:11
**213-229-9500** [1] - 2:22
**213-625-0248** [1] - 2:22
**213-625-1600** [1] - 2:7
**213-625-3900** [1] - 2:6

**2500** [1] - 2:21
**255** [1] - 3:5
**25th** [1] - 20:11

**3**

**3** [1] - 4:5
**312** [1] - 1:23
**323-302-9488** [1] - 2:15
**323-931-4990** [1] - 2:15
**340** [1] - 32:24
**350** [1] - 2:20
**354.4** [1] - 32:21
**354.45** [2] - 32:24, 33:21
**360** [1] - 2:14

**4**

**4** [2] - 4:7, 29:2
**432** [1] - 1:23

**5**

**5** [2] - 29:2, 30:25

**6**

**6310** [1] - 2:13
**644** [2] - 2:5, 2:9
**655** [1] - 3:5

**7**

**70** [2] - 32:6, 33:7

**8**

**894-2969** [1] - 1:24

**9**

**90012** [1] - 1:24
**90017** [2] - 2:6, 2:10
**90048** [1] - 2:14
**90071-1503** [1] - 2:21

**A**

**A.M** [1] - 4:1
**A2** [3] - 18:24, 22:2, 35:1
**A3** [4] - 18:24, 19:2,

21:24, 34:25
**able** [3] - 21:10, 30:7, 33:8
**absolutely** [2] - 34:7, 34:8
**account** [2] - 6:17, 6:18
**acknowledges** [3] - 13:21, 13:22, 13:24
**Act** [1] - 10:14
**action** [3] - 4:16, 4:18, 24:17
**actions** [3] - 4:21, 4:23, 4:25
**activity** [12] - 5:19, 13:1, 13:5, 13:11, 13:25, 14:8, 14:11, 14:13, 14:16, 14:23, 14:24, 15:14
**acts** [1] - 12:9
**actual** [2] - 21:21, 27:9
**add** [2] - 27:8, 28:5
**additional** [1] - 23:12
**address** [2] - 16:16, 22:2
**addressed** [1] - 28:5
**addressing** [1] - 23:10
**adjourned** [1] - 35:5
**adjudged** [1] - 20:15
**adopted** [1] - 10:7
**affairs** [1] - 33:4
**affect** [4] - 12:15, 12:17, 15:12
**affects** [1] - 12:18
**agreed** [1] - 20:12
**Agreement** [1] - 33:4
**agreements** [1] - 17:18
**airforce** [2] - 14:18, 14:19
**aKcourtreporting.com** [1] - 1:25
**al** [5] - 1:13, 4:6, 4:7, 4:8
**Alex** [1] - 4:7
**allegation** [21] - 6:7, 6:25, 8:2, 8:3, 8:4, 8:5, 9:9, 9:25, 10:23, 11:2, 11:5, 15:3, 15:5, 15:10, 15:18, 15:21, 17:2, 29:6, 31:21, 32:17, 33:10
**Allegations** [1] - 9:19
**allegations** [12] - 6:12, 7:4, 10:5, 16:2, 16:19, 17:10, 22:17, 26:7, 26:8, 26:15, 27:14, 30:4
**allege** [9] - 13:9, 13:10, 13:25, 22:5,

29:4, 29:25, 30:1, 30:7, 32:10
**alleged** [14] - 5:11, 5:15, 5:24, 6:19, 7:15, 8:15, 11:7, 11:21, 11:24, 13:7, 16:23, 23:2, 29:1, 33:3
**allegedly** [4] - 6:21, 7:16, 10:12, 11:15
**allies** [1] - 20:15
**allow** [2] - 23:13, 25:4
**allowed** [1] - 29:11
**almost** [1] - 24:22
**amend** [3] - 29:13, 29:21
**America** [1] - 14:19
**American** [4] - 11:19, 14:18, 15:3
**analysis** [2] - 25:17, 33:16
**ancestors** [3] - 29:3, 29:19
**Angeles** [6] - 1:18, 1:24, 2:6, 2:10, 2:14, 2:21
**Ankara** [1] - 33:3
**Anne** [2] - 1:22, 36:11
**annekielwasser@gmail.com** [1] - 1:25
**answer** [8] - 5:22, 11:12, 12:24, 13:3, 14:12, 18:3, 18:9, 18:10
**answers** [1] - 5:22
**Appearances** [1] - 2:25
**appearances** [1] - 4:9
**APPEARANCES** [1] - 3:1
**applicable** [5] - 9:11, 11:4, 18:4, 33:20, 33:21
**applied** [1] - 28:14
**applies** [2] - 5:13, 28:11
**apply** [5] - 5:24, 8:24, 19:8, 21:13, 30:17
**appreciate** [1] - 35:3
**appropriate** [6] - 11:18, 14:1, 14:8, 29:21, 34:18, 34:25
**appropriation** [1] - 7:6
**argue** [1] - 13:20
**argued** [1] - 34:14
**arguing** [1] - 24:5
**argument** [9] - 5:3, 6:23, 7:17, 11:15, 13:24, 14:25, 30:9, 30:24, 32:13

**arguments** [1] - 10:15
**Armenia** [1] - 31:17
**Armenian** [1] - 20:16
**Armenians** [11] - 9:20, 16:25, 17:9, 17:10, 18:5, 22:6, 24:18, 24:19, 24:21, 29:3
**art** [1] - 7:24
**Asia** [1] - 33:15
**aside** [1] - 15:22
**assert** [1] - 5:8
**asserting** [2] - 17:25, 24:11
**assets** [2] - 23:4, 25:25
**assuming** [4] - 12:4, 12:11, 14:8, 25:4
**assumption** [1] - 9:15
**attached** [2] - 27:10, 31:2
**attention** [2] - 20:21, 21:21
**attribute** [3] - 12:1, 12:3, 12:8
**authority** [1] - 23:13
**Avenue** [1] - 2:7
**avoid** [1] - 19:6

**B**

**bag** [1] - 26:20
**Bakalian** [11] - 4:7, 4:18, 5:18, 7:9, 14:17, 15:7, 18:15, 18:17, 27:9, 28:15, 29:2
**banc** [3] - 5:21, 20:11, 32:22
**Bank** [1] - 30:19
**bank** [7] - 5:10, 7:15, 25:19, 32:8, 32:10, 32:24
**bank's** [2] - 12:15, 12:18
**banks** [16] - 8:3, 8:4, 12:5, 12:22, 15:24, 22:25, 23:3, 23:25, 24:4, 26:24, 27:3, 27:13, 27:22
**bar** [2] - 25:5, 32:3
**base** [3] - 14:18, 14:19, 14:22
**based** [6] - 13:12, 18:23, 25:10, 26:2, 26:8, 33:9
**basic** [1] - 15:17
**basis** [1] - 32:15
**become** [1] - 26:3
**beginning** [1] - 16:6

behalf [1] - 1:8
BEHALF [3] - 2:3, 2:18, 3:3
belied [1] - 24:9
benefit [1] - 27:25
between [5] - 5:25, 31:2, 31:17, 32:5, 32:18
binding [4] - 21:20, 34:1, 34:2, 34:8
Boulevard [1] - 2:13
bound [1] - 21:11
BOYD [11] - 2:12, 4:17, 18:18, 18:21, 19:4, 19:11, 21:16, 22:16, 27:8, 27:24, 34:20
Boyd [2] - 2:13, 4:17
briefed [1] - 32:13
briefing [1] - 35:3
bright [1] - 11:25
bring [1] - 32:20
broad [2] - 31:4, 31:19
brought [1] - 19:24
Brown [5] - 2:9, 2:20, 4:15, 4:20, 4:22
build [2] - 11:10, 11:11

**C**

CA [4] - 2:6, 2:10, 2:14, 2:21
CALIFORNIA [1] - 1:2
California [3] - 1:18, 1:24, 25:18
cannot [4] - 12:1, 12:3, 13:10
case [51] - 5:7, 5:14, 5:21, 6:1, 6:2, 6:15, 7:9, 7:11, 7:13, 7:14, 7:23, 8:17, 8:24, 10:23, 11:11, 12:2, 12:3, 12:7, 13:14, 14:17, 15:10, 15:17, 16:3, 17:12, 19:13, 19:16, 20:2, 20:10, 21:6, 21:13, 22:22, 23:18, 24:5, 25:1, 27:9, 27:21, 28:6, 28:7, 28:8, 28:11, 29:2, 29:22, 32:12, 33:12, 33:18, 34:4, 34:12, 34:14
cases [17] - 5:8, 6:3, 6:12, 6:15, 6:19, 7:2, 8:9, 8:13, 10:18, 13:7, 15:15, 16:4, 16:8, 18:16, 19:22,

21:21, 22:18
cash [1] - 26:23
Cassirer [17] - 6:1, 6:8, 6:15, 6:24, 7:17, 8:7, 8:23, 11:12, 12:3, 12:7, 16:3, 19:6, 19:12, 21:8, 30:9, 30:10
category [1] - 34:6
CENTRAL [1] - 1:2
certainly [1] - 6:17
certify [1] - 36:2
charged [1] - 36:5
choice [2] - 14:5, 28:6
Chudian [1] - 19:23
Chuidian [5] - 6:15, 19:14, 19:23, 21:8, 30:18
Churidian [1] - 19:15
circuit [2] - 32:12, 36:5
Circuit [21] - 5:21, 6:5, 6:18, 7:23, 10:6, 12:23, 13:8, 13:9, 19:12, 19:18, 20:8, 20:9, 20:11, 21:11, 21:12, 21:18, 21:20, 21:25, 28:10, 32:22, 33:12
circumstances [12] - 7:3, 8:11, 8:18, 8:21, 9:23, 10:5, 10:9, 14:10, 19:20, 26:3, 28:12, 28:18
cited [3] - 28:6, 30:25, 32:23
citing [1] - 30:18
citizen [16] - 6:20, 9:13, 9:14, 9:16, 10:11, 11:10, 11:13, 11:14, 11:16, 16:21, 16:22, 16:25, 17:1, 19:9, 30:17
citizen's [1] - 34:23
citizens [25] - 5:25, 6:13, 8:14, 9:7, 9:10, 11:1, 11:3, 11:4, 11:21, 16:24, 17:9, 17:20, 17:25, 18:6, 18:10, 21:14, 22:7, 22:8, 23:22, 29:7, 29:15, 29:19, 30:14
citizenship [6] - 6:9, 6:10, 9:12, 17:12, 18:19, 19:7, 22:4, 30:15, 34:21
claim [1] - 7:25
claiming [1] - 23:25
claims [3] - 10:14, 33:2, 33:17

class [5] - 17:1, 24:16, 24:17, 25:2, 25:3
classify [1] - 16:25
clear [1] - 12:24, 13:20, 15:10, 31:12
cleared [1] - 33:8
clearly [8] - 14:23, 15:15, 16:22, 17:18, 18:12, 21:12, 30:20
CLERK [1] - 4:5
client [1] - 29:14
clients [2] - 29:14, 29:17
clients' [1] - 29:14
cloaked [1] - 24:1
close [1] - 24:23
closed [1] - 29:5
closing [1] - 34:20
coming [1] - 16:8
commercial [10] - 5:16, 5:19, 13:1, 13:5, 13:10, 13:25, 14:8, 14:13, 14:24, 15:13
commingled [1] - 25:12
commingling [1] - 23:4
commission [1] - 21:23
common [6] - 25:15, 25:11, 28:14, 28:17, 28:19
compared [1] - 11:6
Complaint [14] - 13:21, 16:20, 16:23, 17:6, 22:5, 22:15, 26:8, 26:9, 26:21, 27:10, 27:14, 28:15, 29:2
complaints [1] - 33:9
Complaints [2] - 22:17, 28:14
completely [1] - 11:18
concept [1] - 20:4
concern [1] - 13:12
conditions [1] - 20:23
conduct [1] - 17:4
conference [1] - 36:7
conflict [1] - 8:7
conformance [1] - 36:6
Congress [11] - 7:3, 7:5, 7:7, 8:11, 8:12, 10:16, 10:18, 11:10, 14:5, 16:6, 21:2
connected [1] - 24:18
consensus [2] - 6:5, 10:8
consider [1] - 17:8

considered [7] - 18:5, 18:6, 19:17, 19:20, 22:8, 30:13, 31:5
consistent [2] - 29:25, 30:1
constitutionality [1] - 32:22
constructive [1] - 25:7
contained [1] - 17:6
context [3] - 5:7, 21:17, 33:13
continued [2] - 2:25, 28:13
CONTINUED [1] - 3:1
continuing [5] - 25:7, 25:13, 25:20, 27:25, 28:16
contrary [1] - 21:19
Convention [1] - 20:21
convince [1] - 21:10
copies [1] - 28:7
correct [2] - 12:18, 36:2
counsel [3] - 4:9, 5:1, 5:3
country [7] - 6:20, 8:15, 9:4, 19:9, 24:24, 30:18
couple [1] - 27:8
course [1] - 28:1
court [4] - 18:14, 19:6, 21:11, 33:25
COURT [36] - 1:1, 4:5, 4:13, 5:1, 6:22, 9:18, 10:21, 12:11, 13:4, 16:9, 16:11, 16:18, 17:2, 17:22, 18:15, 18:20, 19:3, 19:5, 21:9, 22:13, 22:24, 24:11, 25:4, 25:22, 26:13, 26:18, 27:6, 27:21, 28:22, 29:10, 30:22, 33:24, 34:9, 34:11, 34:19, 35:2
Court [29] - 1:23, 6:3, 6:4, 8:23, 9:3, 10:7, 13:2, 16:17, 16:20, 17:13, 17:15, 17:17, 19:14, 20:3, 20:7, 21:7, 23:13, 23:16, 26:6, 29:20, 30:11, 30:14, 30:20, 33:5, 34:13, 34:15, 34:18, 35:5, 36:11
Court's [2] - 20:20, 21:20
courts [2] - 6:5, 14:5
CRAWFORD [11] - 2:12, 4:17, 18:18,

18:21, 19:4, 19:11, 21:16, 22:16, 27:8, 27:24, 34:20
Crawford [1] - 4:17
crime [1] - 21:23
crimes [1] - 21:17
crops [1] - 27:1
crumbled [1] - 15:20
crumbling [1] - 15:19
crux [1] - 15:21
Cruz [1] - 28:7
CSR [2] - 1:22, 36:11
cutback [1] - 13:23

**D**

date [1] - 32:13
Date [1] - 36:11
DAVID [1] - 3:4
David [1] - 4:24
DAVOYAN [1] - 1:8
Davoyan [11] - 4:6, 4:11, 4:12, 4:16, 5:14, 13:21, 15:10, 16:15, 18:16, 27:11, 32:24
de [6] - 22:7, 23:19, 23:20, 23:21, 23:22
dealing [2] - 11:18, 17:19
deals [1] - 27:9
decades [5] - 16:8, 32:16, 32:17, 32:19
December [1] - 1:18
DECEMBER [1] - 4:1
decided [1] - 30:12
decision [4] - 6:24, 19:6, 33:1, 33:25
Declaration [1] - 31:3
declaration [3] - 11:14, 12:12, 17:3
declarations [2] - 17:15, 20:18
declared [7] - 9:1, 9:7, 11:13, 32:11, 32:25, 33:19, 33:21
deeds [2] - 26:23, 27:10
default [1] - 28:2
defect [2] - 7:25, 8:1
defendant [1] - 9:25
defendants [10] - 1:14, 4:20, 4:21, 4:23, 4:24, 5:10, 7:15, 11:23, 15:4, 28:5
DEFENDANTS [2] - 2:18, 3:3
defense [2] - 17:14,

21:19
**defy** [1] - 27:14
**degrees** [1] - 24:18
**Deirmenjian** [3] - 32:12, 33:1, 34:12
**deport** [3] - 9:20, 16:21, 16:22
**deportation** [7] - 11:7, 24:14, 29:9, 31:14, 31:18, 31:24, 31:25
**deportations** [3] - 23:22, 31:15, 31:16
**deported** [8] - 10:25, 11:1, 11:5, 11:8, 11:16, 11:20, 22:11, 31:20
**deporting** [1] - 18:9
**deposit** [3] - 25:19, 32:8, 36:6
**deposited** [2] - 26:24, 27:3
**deposits** [3] - 32:9, 32:10, 32:24
**describe** [1] - 29:2
**detail** [1] - 33:6
**details** [1] - 16:20
**determinations** [1] - 26:4
**determined** [3] - 20:7, 20:9, 21:21
**Deutsche** [1] - 33:11
**developed** [2] - 8:14, 10:18
**diamonds** [1] - 26:23
**difference** [4] - 9:18, 9:22, 9:23, 10:5
**different** [6] - 8:20, 10:22, 12:6, 13:6, 14:3
**difficult** [1] - 24:25
**direct** [2] - 20:20, 21:20
**disagreed** [1] - 10:8
**discovery** [22] - 17:16, 17:23, 17:25, 18:2, 18:22, 22:14, 22:18, 22:23, 23:10, 23:12, 23:15, 23:20, 24:7, 24:10, 25:1, 25:5, 26:4, 29:12, 29:18, 30:2, 30:8
**discrete** [1] - 17:16
**discuss** [1] - 35:1
**dispute** [2] - 5:10, 12:6
**distinction** [1] - 11:25
**distinctions** [1] - 34:16
**distinguish** [1] - 34:4
**district** [4] - 18:14,

32:14, 33:23, 34:1
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 28:8
**disturb** [1] - 14:6
**diverge** [2] - 22:20, 27:11
**doctrine** [2] - 28:16, 28:17
**document** [1] - 3:6
**DOLLY** [1] - 1:4
**Dominions** [2] - 31:4
**done** [5] - 8:15, 15:16, 15:25, 16:1
**draft** [1] - 7:3
**draw** [3] - 10:16, 10:17, 16:7
**driven** [1] - 24:23
**drops** [1] - 30:14
**dsaltzman@turklaw. net** [1] - 3:7
**during** [9] - 18:25, 19:16, 19:19, 20:15, 20:16, 20:20, 21:22, 24:25, 28:18

---

### E

**economy** [2] - 15:3, 15:12
**effect** [4] - 15:2, 25:11, 31:1, 31:8
**either** [3] - 6:23, 15:14, 17:16
**election** [1] - 13:14
**Email** [5] - 2:7, 2:11, 2:16, 2:23, 3:7
**embodied** [1] - 18:11
**Empire** [18] - 6:14, 9:11, 9:16, 9:21, 11:3, 11:4, 15:19, 17:3, 17:8, 17:11, 18:12, 29:7, 31:10, 31:11, 31:16, 31:18, 31:20
**en** [3] - 5:21, 20:11, 32:22
**end** [1] - 16:5
**ends** [1] - 6:16
**entire** [1] - 8:14
**entitled** [1] - 10:16
**entity** [3] - 10:2, 11:22, 27:16
**Eqbal** [1] - 28:21
**equitable** [4] - 26:15, 28:13, 28:16, 32:16
**essentially** [1] - 7:18
**established** [1] - 13:7
**estate** [2] - 7:11, 7:13
**et** [5] - 1:13, 4:6, 4:7,

4:8
**ethnic** [2] - 17:9, 18:5
**Europe** [1] - 33:15
**event** [1] - 23:1
**events** [1] - 33:7
**eventually** [1] - 15:23
**evidence** [1] - 16:1
**evidentiary** [3] - 17:17, 23:13, 23:15
**Evinch** [1] - 3:5
**exactly** [4] - 7:17, 23:2, 23:3, 23:17
**example** [4] - 7:22, 12:1, 29:1, 33:11
**exception** [37] - 5:8, 5:13, 5:14, 5:15, 5:16, 5:18, 5:19, 5:24, 6:25, 7:5, 7:7, 8:13, 8:16, 8:19, 9:6, 10:13, 10:19, 10:20, 10:22, 11:11, 11:12, 11:19, 13:1, 13:5, 13:10, 13:11, 14:13, 14:14, 15:14, 19:8, 21:5, 21:13, 21:24, 23:1, 30:16, 31:11
**exceptional** [2] - 28:12, 28:18
**excepts** [1] - 5:23
**exist** [1] - 16:2
**expert** [1] - 20:18
**expressly** [1] - 12:24
**expropriated** [6] - 6:11, 6:13, 7:24, 10:24, 12:10, 25:9
**expropriates** [2] - 19:10, 30:18
**expropriating** [3] - 9:4, 10:2, 11:21
**expropriation** [30] - 5:15, 5:18, 5:25, 6:7, 6:14, 6:16, 6:19, 6:21, 7:6, 7:8, 8:2, 8:13, 8:15, 8:18, 8:19, 9:1, 9:23, 10:1, 10:3, 10:13, 11:24, 13:2, 13:10, 13:20, 13:25, 15:2, 15:17, 16:3, 16:6, 28:18
**expropriations** [3] - 5:8, 5:24, 8:20
**expropriator** [1] - 9:7
**extended** [1] - 33:18
**extent** [1] - 22:18

---

### F

**fact** [10] - 10:25, 11:8, 11:10, 15:3, 17:8,

17:21, 17:24, 21:6, 26:7, 29:15
**facto** [4] - 11:16, 22:7, 23:19, 23:21
**Factual** [1] - 9:19
**factual** [6] - 10:23, 16:23, 24:4, 26:3, 26:21, 31:22
**fairly** [2] - 5:7, 31:14
**fall** [2] - 9:6, 21:23
**falls** [1] - 18:12
**family** [1] - 24:23
**far** [1] - 28:4
**Fax** [5] - 2:7, 2:11, 2:15, 2:22, 3:7
**Federal** [1] - 1:23
**federal** [6] - 18:13, 28:11, 28:14, 28:17, 28:19
**fee** [1] - 36:5
**fees** [1] - 36:5
**few** [2] - 16:11, 29:1
**Fifth** [1] - 13:9
**Fifteenth** [1] - 3:5
**Figueroa** [1] - 2:5
**Figueroa** [1] - 2:9
**figure** [1] - 29:18
**filed** [1] - 24:16
**final** [1] - 22:8
**first** [5] - 7:1, 14:13, 20:6, 27:14, 28:25
**fit** [6] - 10:19, 14:6, 14:9, 15:15, 16:7, 20:4
**five** [2] - 24:19, 28:23
**fleshed** [1] - 23:9
**flip** [1] - 13:17
**flipped** [1] - 13:13
**flows** [1] - 8:5
**focus** [2] - 5:3, 28:25
**footnote** [1] - 30:15
**Footnote** [1] - 30:15
**foregoing** [1] - 36:2
**foreign** [6] - 5:25, 7:2, 21:14, 22:19, 31:6, 33:4
**Foreign** [1] - 10:13
**form** [1] - 15:24
**formed** [1] - 27:2
**forth** [1] - 20:22
**forward** [1] - 20:17
**foundation** [2] - 12:2, 12:8
**foundations** [1] - 12:7
**fours** [3] - 34:5, 34:14, 34:17
**FSIA** [11] - 5:6, 5:8, 6:17, 7:4, 19:2, 19:25, 21:2, 27:15,

27:17, 28:8, 29:22
**fully** [2] - 28:15, 32:13

---

### G

**Garbis** [1] - 4:5
**GARBIS** [1] - 1:8
**garden** [2] - 7:11, 7:12
**garden-variety** [2] - 7:11, 7:12
**GEE** [1] - 1:4
**Genocide** [1] - 20:21
**genocide** [14] - 6:25, 7:4, 7:14, 8:5, 18:25, 19:14, 19:17, 20:3, 20:12, 20:16, 20:20, 21:17, 28:18, 34:24
**GERAGOS** [16] - 2:4, 4:10, 4:11, 16:14, 16:19, 17:5, 18:2, 18:17, 23:2, 24:15, 25:6, 25:24, 26:16, 26:20, 27:7, 34:12
**Geragos** [11] - 2:5, 4:11, 4:12, 16:14, 22:3, 22:14, 22:24, 29:17, 32:7
**Geragos'** [2] - 28:5, 29:11
**German** [1] - 8:25
**Germans** [1] - 20:1
**Germany** [2] - 30:12, 30:14
**given** [2] - 7:16, 27:21
**gold** [1] - 26:23
**government** [2] - 12:9, 12:12
**Grand** [1] - 2:20
**grant** [1] - 5:8
**granted** [1] - 29:13
**grants** [1] - 29:20
**great** [1] - 12:6
**grounds** [2] - 33:2, 33:3

---

### H

**hand** [1] - 9:9
**happy** [1] - 13:2
**head** [1] - 13:13
**Hearing** [1] - 1:17
**hearing** [3] - 17:17, 23:13, 23:15
**held** [9] - 19:8, 20:12, 21:5, 21:24, 23:5, 23:6, 25:10, 27:16, 30:16
**HENRY** [1] - 2:19

**hereby** [1] - 36:2
**highly** [2] - 34:7
**historians** [1] - 20:18
**historically** [1] - 31:15
**hold** [1] - 26:2
**holding** [5] - 7:25, 21:18, 25:24, 27:22, 30:10
**holocaust** - 33:13, 33:14
**Honor** [11] - 4:10, 4:14, 4:19, 5:5, 16:14, 18:22, 19:15, 21:16, 27:7, 28:3, 28:24
**HONORABLE** [1] - 1:4
**humanity** [2] - 21:18, 21:23
**hundred** [1] - 25:23

**I**

**II** [1] - 33:14
**Illinois** [1] - 28:8
**immediately** [1] - 25:9
**immune** [1] - 5:12
**Immunities** [1] - 10:13
**immunity** [4] - 5:9, 7:2, 22:20, 24:1
**Imperial** [4] - 31:4, 31:10
**implication** [1] - 12:25
**implicitly** [2] - 13:21, 13:23
**impression** [1] - 20:7
**include** [1] - 21:17
**including** [1] - 20:23
**indeed** [1] - 20:14
**individually** [1] - 1:8
**individuals** [3] - 12:13, 22:9, 24:11
**inhabiting** [2] - 31:3, 31:9
**instrumentalities** - 5:11
**instruments** [1] - 27:4
**insurance** [1] - 32:23
**interconnections** [1] - 24:20
**interest** [1] - 24:13
**interesting** [1] - 21:10
**international** [13] - 18:24, 19:1, 19:20, 20:5, 20:12, 20:17, 20:25, 21:1, 21:3, 21:5, 27:19, 34:22, 34:24
**intimate** [1] - 24:23
**involved** [5] - 11:24,

14:15, 16:5, 29:5
**involves** [1] - 27:21
**ipso** [1] - 11:16
**irreconcilable** [1] - 19:22
**irrelevant** [1] - 10:9
**issue** [22] - 5:3, 7:1, 7:13, 7:14, 7:23, 8:23, 12:6, 12:19, 14:7, 14:8, 19:8, 22:3, 23:17, 25:14, 25:21, 26:9, 27:18, 28:6, 30:8, 30:17, 30:21, 31:22
**issues** [5] - 7:9, 10:14, 12:22, 13:6, 33:13
**item** [1] - 4:5
**Item** [1] - 4:7
**items** [2] - 17:18, 26:24
**itself** [2] - 13:16, 20:21

**J**

**Jew** [1] - 8:25
**Jews** [3] - 9:1, 22:7, 30:13
**JOHN** [1] - 2:4
**joke** [1] - 24:17
**judge** [2] - 34:3, 34:5
**JUDGE** [1] - 1:4
**Judge** [6] - 32:5, 32:10, 33:1, 33:15, 33:24, 34:14
**judges** [1] - 34:1
**judicial** [1] - 36:7
**jure** [3] - 23:19, 23:20, 23:23
**jurisdiction** [11] - 5:4, 6:19, 17:23, 18:7, 18:13, 19:25, 22:12, 23:18, 27:17, 29:22, 34:25
**jurisdictional** [16] - 18:22, 22:14, 22:18, 22:23, 23:10, 23:11, 23:14, 23:20, 24:7, 24:25, 25:5, 27:16, 29:11, 29:18, 30:2, 30:8
**justices** [2] - 6:4, 10:7

**K**

**Kabateck** [2] - 2:9, 4:15
**Kaufman** [1] - 4:12
**KAUFMAN** [1] - 2:4
**keeping** [1] - 25:24

**Kellner** [2] - 2:9, 4:15
**Kielwasser** [3] - 1:22, 36:10, 36:11
**kind** [6] - 7:6, 7:8, 23:9, 24:3, 25:15, 25:20
**kinds** [5] - 24:8, 26:19, 26:24, 27:1, 30:4
**knows** [2] - 7:3, 26:6

**L**

**laid** [1] - 24:6
**large** [1] - 24:21
**law** [35] - 11:9, 11:11, 11:17, 11:19, 13:8, 13:14, 14:3, 14:4, 18:24, 19:1, 19:21, 20:5, 20:13, 20:17, 20:18, 20:19, 20:25, 21:1, 21:3, 21:5, 21:13, 21:20, 25:15, 27:19, 28:6, 28:11, 28:12, 28:14, 28:17, 28:19, 29:20, 31:1, 34:22, 34:24
**law.com** [1] - 2:16
**lawful** [1] - 11:1
**laws** [1] - 25:11
**lawsuit** [1] - 32:20
**lboyd@srbr** [1] - 2:16
**lboyd@srbr-law. com** [1] - 2:16
**leading** [1] - 6:15
**leased** [2] - 14:19, 14:21
**least** [3] - 10:8, 32:14, 33:22
**leave** [3] - 29:13, 29:21, 30:12
**lee** [1] - 4:17
**LEE** [1] - 2:12
**less** [1] - 36:5
**lessee** [1] - 14:21
**liability** [4] - 12:15, 12:16, 12:18, 12:19
**life** [1] - 20:23
**limitations** [10] - 25:14, 25:21, 26:9, 26:13, 28:4, 28:9, 28:20, 33:2, 33:13, 33:17
**limited** [2] - 17:16, 17:23
**line** [3] - 11:25, 16:7
**lines** [1] - 10:16
**livable** [1] - 20:23
**LLP** [5] - 2:9, 2:13, 2:20, 4:20, 4:23

**look** [5] - 14:7, 14:9, 30:11, 32:3, 33:11
**looked** [1] - 12:20
**loosely** [1] - 31:14
**Los** [6] - 1:18, 1:24, 2:6, 2:10, 2:14, 2:21
**lower** [1] - 6:5

**M**

**major** [1] - 34:15
**majority** [1] - 24:21
**Malzahn** [1] - 4:15
**MALZAHN** [2] - 2:8, 4:14
**manner** [1] - 31:7
**MARK** [1] - 2:4
**Mark** [2] - 4:10, 16:14
**mark@geragos.com** [1] - 2:7
**Marmolejo** [1] - 4:22
**MARMOLEJO** [2] - 2:19, 4:22
**massacred** [1] - 24:24
**matter** [11] - 5:4, 17:23, 18:7, 18:13, 23:18, 29:20, 29:22, 32:5, 34:21, 35:4, 36:4
**matters** [4] - 6:11, 19:7, 30:16, 35:4
**MATTHEW** [2] - 2:8, 2:19
**Matthew** [1] - 4:22
**Mayer** [3] - 2:20, 4:20, 4:22
**means** [1] - 20:22
**members** [1] - 24:17
**merely** [1] - 27:18
**merits** [1] - 22:21
**military** [1] - 14:22
**minutes** [2] - 16:11, 28:23
**misappropriated** [1] - 25:9
**mixed** [1] - 26:20
**MONDAY** [1] - 4:1
**Monday** [1] - 1:18
**money** [1] - 25:12
**moneys** [1] - 27:3
**morning** [6] - 4:10, 4:13, 4:14, 4:19, 5:1, 5:5
**morning's** [1] - 5:3
**Morrow** [2] - 32:10, 34:15
**Morrow's** [2] - 33:1, 33:24
**most** [1] - 32:9

**Motion** [1] - 1:17
**motion** [3] - 26:5, 29:12, 31:1
**motions** [1] - 26:14
**move** [1] - 29:10
**movement** [2] - 31:16, 31:25
**moving** [2] - 4:21, 22:19
**MR** [31] - 4:10, 4:14, 4:19, 4:22, 4:24, 5:5, 7:1, 9:22, 11:2, 12:17, 13:5, 16:10, 16:13, 16:14, 16:19, 17:5, 18:2, 18:17, 23:2, 24:15, 25:6, 25:24, 26:16, 26:20, 27:7, 28:24, 29:16, 30:23, 34:2, 34:10, 34:12
**MS** [10] - 4:17, 18:18, 18:21, 19:4, 19:11, 21:16, 22:16, 27:8, 27:24, 34:20
**Murphy** [1] - 31:2
**Museum** [1] - 12:2

**N**

**nation** [4] - 5:25, 6:1, 10:11, 11:13
**national** [2] - 6:20, 8:25
**National** [1] - 30:19
**nationality** [1] - 31:1
**nationals** [2] - 20:5, 29:5
**nature** [2] - 26:4, 26:25
**Nazi** [2] - 12:9, 20:1
**Nazis** [2] - 7:24, 9:1
**necessarily** [3] - 16:5, 17:20, 30:6
**necessary** [3] - 6:23, 8:22, 31:7
**need** [3] - 10:19, 29:17, 30:8
**NEIL** [1] - 2:19
**Neil** [1] - 4:19
**never** [5] - 19:14, 19:17, 21:7, 21:21, 21:24
**Ninth** [20] - 5:21, 6:5, 6:18, 7:23, 10:6, 12:23, 13:8, 19:12, 19:18, 20:8, 20:9, 20:11, 21:11, 21:12, 21:18, 21:20, 21:24, 28:10, 32:22, 33:12

**nobody** [2] - 12:8, 32:1
**non** [6] - 20:5, 20:23, 22:7, 22:8, 30:14
**non-citizens** [4] - 22:7, 22:8, 30:14
**non-livable** [1] - 20:23
**non-nationals** [1] - 20:5
**noncitizens** [7] - 9:2, 9:5, 10:25, 12:13, 12:14, 19:19
**noncitizenship** [2] - 18:20, 18:21
**none** [1] - 33:6
**nonparty** [1] - 6:10
**North** [1] - 1:23
**Northern** [2] - 12:2, 28:8
**note** [1] - 28:3
**nothing** [3] - 14:23, 15:7, 33:23
**nsoltman@ mayerbrown.com** [1] - 2:23
**nuclear** [1] - 24:23
**number** [2] - 25:1, 34:6
**NW** [1] - 3:5

## O

**object** [2] - 26:1, 26:2
**obvious** [2] - 32:4, 32:5
**obviously** [13] - 5:9, 6:6, 12:22, 14:1, 14:12, 14:17, 14:20, 14:21, 15:6, 31:19, 32:19, 33:5, 34:13
**occur** [1] - 33:10
**occurred** [2] - 9:1, 15:1
**October** [1] - 20:11
**OF** [4] - 1:2, 2:3, 2:18, 3:3
**offhanded** [1] - 5:23
**Official** [1] - 1:23
**official** [2] - 17:3, 36:11
**often** [3] - 5:20, 7:2, 24:17
**ON** [3] - 2:3, 2:18, 3:3
**once** [4] - 25:10, 25:11, 25:12, 33:17
**one** [17] - 6:23, 7:9, 12:6, 12:21, 13:6, 13:7, 13:17, 13:18, 14:10, 15:8, 17:12,

20:22, 23:8, 25:1, 33:8, 34:3
**one's** [1] - 34:23
**opening** [1] - 31:1
**operating** [1] - 14:22
**opinion** [1] - 33:12
**oppose** [2] - 18:22, 22:17
**opposed** [4] - 14:16, 17:3, 31:25, 34:17
**Opposition** [4] - 5:16, 13:23, 23:3, 30:25
**order** [2] - 17:13, 17:16
**orders** [1] - 24:14
**otherwise** [1] - 34:5
**Ottoman** [26] - 6:14, 9:11, 9:15, 9:16, 9:21, 11:3, 11:4, 15:19, 17:3, 17:8, 17:11, 17:20, 18:12, 24:22, 29:7, 31:1, 31:5, 31:10, 31:16, 31:17, 31:18, 31:20
**ought** [1] - 30:7
**outcome** [1] - 23:14
**own** [5] - 18:10, 21:14, 29:5, 32:2, 34:23
**owner** [1] - 30:12
**owners** [1] - 24:12

## P

**page** [2] - 30:11, 30:25
**painting** [1] - 8:25
**panel** [1] - 33:19
**papers** [6] - 5:16, 9:11, 13:23, 30:25, 31:1, 32:24
**paragraph** [1] - 29:4
**paragraphs** [2] - 29:1, 29:2
**part** [4] - 10:2, 14:18, 22:23, 30:10
**participants** [1] - 8:4
**participating** [1] - 10:3
**particular** [8] - 7:6, 7:7, 11:5, 14:10, 20:10, 21:6, 21:22, 33:17
**particularly** [2] - 8:19, 9:24
**parties** [1] - 24:2
**parties'** [1] - 35:3
**party** [1] - 6:10
**passed** [3] - 7:4, 10:18, 21:2
**pattern** [1] - 21:6

**PC** [1] - 3:5
**people** [13] - 9:4, 9:10, 10:23, 11:20, 11:23, 16:24, 17:20, 20:22, 24:13, 30:3, 31:17, 32:19
**perceive** [1] - 26:10
**perhaps** [2] - 7:20, 21:10
**period** [5] - 11:24, 14:4, 15:18, 26:2, 26:13
**permeates** [1] - 25:2
**permit** [1] - 6:18
**perpetration** [4] - 18:25, 19:13, 19:17, 34:24
**perpetrator** [2] - 27:17
**perpetrators** [1] - 27:13
**person** [7] - 10:10, 11:5, 16:5, 27:16, 27:20, 31:3, 31:9
**persons** [1] - 6:13
**persuasive** [3] - 33:25, 34:7, 34:13
**petition** [1] - 14:1
**Philippine** [1] - 30:19
**pick** [6] - 13:15, 13:16, 13:17, 13:24, 32:18
**Plaintiff** [2] - 4:12, 4:18
**plaintiff** [3] - 6:9, 19:9, 30:17
**plaintiffs** [6] - 1:11, 4:11, 4:15, 5:7, 7:9, 24:12
**PLAINTIFFS** [1] - 2:3
**plaintiffs'** [2] - 6:22, 29:3
**pleading** [1] - 5:17
**pleadings** [1] - 32:2
**pled** [1] - 28:20
**point** [8] - 7:20, 23:10, 26:10, 26:11, 27:12, 30:24, 31:13
**points** [2] - 27:9, 28:5
**policy** [2] - 14:5, 32:23
**position** [10] - 12:20, 14:2, 14:20, 19:5, 21:19, 22:10, 22:21, 22:25, 34:21, 34:22
**positions** [1] - 24:9
**positive** [1] - 19:23
**possessed** [1] - 12:5
**possesses** [1] - 12:9
**possession** [1] - 27:4
**possessor** [1] - 12:4
**possible** [1] - 32:17
**practice** [1] - 25:16

**precisely** [6] - 23:10, 23:16, 23:24, 24:7, 26:11, 26:16
**predecessors** [1] - 29:15
**preemption** [1] - 33:4
**present** [2] - 17:17, 27:23
**PRESIDING** [1] - 1:4
**presumably** [2] - 29:17, 30:3
**presumptively** [1] - 5:12
**pretrial** [1] - 17:16
**private** [1] - 14:16
**problem** [1] - 32:4
**proceed** [2] - 17:15, 22:22
**proceeding** [1] - 17:14
**proceedings** [1] - 36:3
**Proceedings** [1] - 1:17
**proceeds** [3] - 23:6, 25:8, 27:5
**proclaim** [1] - 23:24
**proclamations** [1] - 18:11
**production** [1] - 24:10
**products** [1] - 27:1
**professor** [1] - 20:18
**profits** [2] - 27:24, 28:1
**pronounce** [2] - 19:15, 19:24
**pronouncement** [1] - 17:7
**properties** [3] - 23:5, 23:6, 26:19
**property** [51] - 6:10, 6:13, 7:16, 7:18, 7:19, 9:10, 10:1, 10:11, 10:12, 10:24, 11:6, 12:4, 12:5, 12:9, 12:10, 14:15, 14:16, 14:17, 14:18, 14:21, 15:1, 15:6, 15:7, 15:9, 15:11, 15:18, 15:23, 16:4, 19:10, 20:16, 20:24, 21:14, 24:12, 26:18, 26:19, 26:22, 27:1, 27:5, 27:10, 27:18, 27:22, 27:24, 28:1, 29:4, 30:4, 30:18, 32:9, 34:23
**proposal** [1] - 29:11
**proposition** [1] - 5:23
**prove** [2] - 9:14, 31:7
**provenance** [2] - 7:19, 24:6

**provides** [1] - 31:3
**purpose** [1] - 31:22
**purposes** [4] - 17:23, 18:6, 26:5, 33:22
**put** [6] - 7:7, 15:22, 16:19, 20:17, 21:2, 24:19
**puts** [1] - 16:2

## Q

**questions** [4] - 13:2, 16:16, 22:3, 23:16
**quickly** [1] - 32:7
**quite** [3] - 5:23, 31:19
**quote** [3] - 9:11, 29:4, 29:5
**quoted** [1] - 30:22

## R

**Rader** [1] - 2:13
**raise** [3] - 5:15, 5:18, 26:10
**rare** [1] - 34:3
**real** [10] - 7:11, 7:12, 15:7, 26:18, 26:22, 27:1, 27:5, 27:9, 27:21, 32:9
**reality** [1] - 26:21
**really** [11] - 7:8, 7:13, 11:16, 12:20, 13:6, 15:17, 15:21, 29:23, 31:21, 31:24, 33:8
**reason** [4] - 7:19, 22:1, 32:23, 34:4
**reasonably** [1] - 33:21
**reasons** [1] - 19:11
**rebuttal** [1] - 16:12
**received** [1] - 10:1
**recent** [1] - 5:21
**recently** [1] - 20:10
**recipient** [1] - 7:18
**recipients** [1] - 7:15
**recognized** [1] - 34:22
**recorded** [1] - 36:3
**reduction** [1] - 36:6
**referred** [2] - 6:4, 6:8
**regard** [7] - 6:16, 6:20, 14:7, 14:22, 15:1, 15:6, 32:3
**regular** [1] - 31:7
**regulations** [1] - 36:7
**Reich** [1] - 22:8
**Reinhardt's** [1] - 33:15
**reiterate** [1] - 26:6
**reiterated** [1] - 25:11

**relate** [1] - 12:22
**related** [2] - 22:21, 31:13
**relates** [1] - 13:6
**relating** [2] - 14:11, 32:24
**relatively** [1] - 34:3
**relied** [1] - 22:11
**relocate** [1] - 9:20
**relying** [1] - 22:1
**remark** [1] - 34:20
**remedies** [1] - 13:14
**remember** [2] - 8:23, 26:3
**rents** [1] - 26:25
**Reporter** [2] - 1:23, 36:11
**Reporter's** [1] - 1:17
**representing** [2] - 25:2, 25:3
**Republic** [7] - 4:6, 4:8, 5:12, 12:15, 12:19, 15:20, 28:2
**REPUBLIC** [1] - 1:13
**request** [4] - 19:4, 23:12, 23:15, 24:8
**requesting** [4] - 18:23, 22:12, 22:13, 23:11
**requests** [1] - 24:10
**requirement** [2] - 27:15, 30:9
**researched** [2] - 12:21, 12:22
**reserve** [2] - 34:17, 34:18
**resident** [1] - 9:15
**residing** [1] - 24:22
**respectfully** [1] - 21:16
**respond** [3] - 6:22, 22:25, 27:12
**responded** [1] - 5:17
**rest** [1] - 24:7
**restatement** [1] - 28:12
**result** [2] - 8:6
**Rimberg** [1] - 2:13
**Rio** [1] - 20:10
**rise** [1] - 25:22
**Room** [1] - 1:23
**room** [1] - 24:19
**ROT** [1] - 25:12
**RPR** [2] - 1:22, 36:11
**Rule** [3] - 29:25, 30:1, 33:9
**rule** [2] - 5:9, 10:6
**rules** [1] - 28:13
**Rymer** [1] - 30:15

## S

**Saher** [4] - 7:23, 8:8, 12:2, 24:5
**SALTZMAN** [2] - 3:4, 4:24
**Saltzman** [2] - 3:5, 4:24
**San** [1] - 2:13
**Sarei** [1] - 20:10
**saving** [1] - 33:16
**Schoenberg** [1] - 28:10
**schwarcz** [1] - 2:13
**scope** [1] - 19:1
**Scott** [1] - 4:14
**SCOTT** [1] - 2:8
**Second** [1] - 13:8
**second** [3] - 7:1, 17:1, 29:20
**second-class** [1] - 17:1
**secondly** [1] - 27:15
**Section** [2] - 28:12, 34:25
**see** [1] - 8:16
**sense** [2] - 23:23, 27:11
**separation** [1] - 24:18
**series** [3] - 6:3, 6:15, 12:25
**serious** [1] - 14:25
**set** [2] - 21:4, 28:15
**sets** [1] - 20:21
**settled** [1] - 20:19
**several** [1] - 10:7
**SHELLEY** [1] - 2:4
**Shelley** [1] - 4:11
**shifted** [1] - 15:11
**show** [9] - 17:18, 17:25, 18:2, 18:4, 18:10, 18:12, 23:21, 23:23, 25:1
**showing** [1] - 17:8
**shown** [1] - 18:8
**shows** [1] - 9:12
**SIC** [1] - 20:16
**Siderman** [2] - 19:16, 21:7
**similar** [1] - 24:5
**similarly** [1] - 1:9
**Simon** [1] - 12:2
**simple** [3] - 10:10, 24:9
**situated** [1] - 1:9
**situation** [4] - 12:8, 13:19, 16:3, 17:19
**slave** [1] - 33:15
**sm@kbklawyers.**

**com** [1] - 2:11
**so-called** [1] - 9:19
**Soltman** [5] - 4:20, 16:9, 23:17, 28:23, 34:9
**SOLTMAN** [15] - 2:19, 4:19, 5:5, 7:1, 9:22, 11:2, 12:17, 13:5, 16:10, 16:13, 28:24, 29:16, 30:23, 34:2, 34:10
**Soltman's** [1] - 22:25
**solution** [1] - 22:9
**somewhat** [1] - 14:2
**sort** [4] - 6:24, 12:11, 13:13, 13:22
**South** [3] - 2:5, 2:9, 2:20
**Sovereign** [1] - 10:13
**sovereign** [4] - 7:2, 14:16, 14:23, 22:19
**Spain** [2] - 19:24, 20:3
**special** [2] - 8:10, 8:11
**specific** [3] - 5:13, 21:3, 33:10
**specifically** [4] - 16:17, 16:20, 18:24, 19:7
**specifics** [1] - 21:4
**specified** [1] - 23:3
**Spring** [1] - 1:23
**stand** [2] - 22:16, 35:4
**standard** [2] - 5:9, 28:21
**standing** [1] - 22:14
**started** [1] - 23:17
**state** [4] - 4:9, 20:19, 21:14, 34:23
**state's** [1] - 29:5
**stateless** [1] - 22:10
**statement** [2] - 19:21, 24:4
**STATES** [1] - 1:1
**States** [9] - 14:11, 14:20, 14:22, 15:4, 15:8, 15:11, 15:12, 28:7, 36:7
**States'** [1] - 14:20
**statue** [1] - 10:17
**status** [1] - 32:5
**statute** [22] - 7:3, 9:12, 10:15, 11:4, 25:14, 25:21, 26:9, 28:4, 28:9, 28:20, 30:24, 31:8, 32:6, 32:8, 32:11, 32:14, 33:2, 33:13, 33:17, 33:18, 33:21
**statutes** [4] - 25:18, 25:19, 32:21

**steal** [1] - 26:1
**stenographically** [1] - 36:3
**still** [3] - 12:14, 25:12, 27:22
**stolen** [1] - 7:18
**straightforward** [1] - 5:7
**Street** [4] - 1:23, 2:5, 2:9, 3:5
**subcategory** [2] - 14:12, 14:13
**subject** [14] - 5:4, 7:25, 17:23, 18:7, 18:13, 23:1, 23:18, 24:13, 26:14, 29:22, 31:5, 31:6, 31:10
**subject-matter** [6] - 5:4, 17:23, 18:7, 18:13, 23:18, 29:22
**submit** [1] - 34:15
**submitted** [1] - 35:4
**successors** [1] - 24:13
**successors-in-interest** [1] - 24:13
**sudden** [1] - 7:24
**sued** [1] - 28:1
**sufficiently** [1] - 28:20
**suggesting** [1] - 17:22
**Suite** [3] - 2:14, 2:21, 3:5
**supposed** [1] - 9:13
**Supreme** [3] - 6:3, 6:4, 10:7
**Syrian** [1] - 17:11

## T

**takings** [8] - 18:25, 19:8, 19:19, 20:15, 20:20, 21:5, 21:13, 30:16
**talks** [2] - 30:11, 33:12
**tandem** [1] - 22:19, 22:22
**tantamount** [2] - 10:24, 12:13
**Tel** [2] - 2:6, 2:22
**tel** [1] - 2:15
**telephone** [1] - 1:24
**tentative** [1] - 5:2
**term** [1] - 31:4
**terms** [4] - 18:4, 19:2, 23:18, 27:1
**THE** [37] - 2:3, 2:18, 3:3, 4:13, 5:1, 6:22, 9:18, 10:21, 12:11, 13:4, 16:9, 16:11,

16:18, 17:2, 17:22, 18:15, 18:20, 19:3, 19:5, 21:9, 22:13, 22:24, 24:11, 25:4, 25:22, 26:13, 26:18, 27:6, 27:21, 28:22, 29:10, 30:22, 33:24, 34:9, 34:11, 34:19, 35:2
**themselves** [3] - 12:23, 27:13, 30:7
**theories** [3] - 28:19, 33:5
**theory** [9] - 18:19, 18:23, 21:10, 22:11, 25:6, 25:8, 28:3, 32:16, 33:7
**therefore** [1] - 34:25
**therefrom** [1] - 28:1
**they've** [1] - 24:8
**Third** [1] - 22:8
**three** [2] - 24:18, 24:19
**threw** [1] - 33:1
**Tinto** [1] - 20:10
**title** [4] - 7:20, 7:24, 8:1
**today** [1] - 33:6
**tolling** [7] - 25:23, 26:15, 28:13, 28:16, 32:16, 32:19, 33:7
**took** [1] - 10:12
**traditional** [1] - 20:4
**traditionally** [1] - 26:14
**Transcript** [1] - 1:17
**transcript** [2] - 36:3, 36:5
**transferred** [1] - 15:23
**treated** [5] - 22:6, 23:21, 31:5, 31:11
**treatise** [3] - 18:4, 18:11, 23:23
**true** [5] - 18:15, 18:19, 19:21, 26:8, 36:2
**trust** [5] - 23:5, 25:7, 25:10, 27:22, 28:2
**try** [1] - 13:17
**trying** [2] - 9:20, 12:8
**Turkey** [10] - 4:6, 4:8, 5:12, 14:19, 14:21, 15:2, 15:20, 24:22, 28:2, 31:17
**TURKEY** [1] - 1:13
**Turkey's** [2] - 12:16, 12:19
**Turkish** [4] - 11:9, 11:17, 12:12, 29:3
**Turkish-Armenians** [1] - 29:3

**Turks** [1] - 9:19
**turned** [1] - 27:2
**two** [7] - 6:4, 7:8, 7:15, 13:6, 19:11, 29:9, 32:8
**twos** [1] - 34:16

## U

**unclear** [2] - 15:9, 15:25
**unconstitutional** [5] - 32:11, 32:14, 32:25, 33:19, 33:22
**undebatable** [1] - 6:2
**under** [18] - 9:18, 11:9, 13:14, 18:24, 19:20, 19:25, 25:18, 26:20, 27:15, 27:17, 28:11, 28:14, 28:19, 28:20, 33:3, 33:4, 34:25
**underlying** [7] - 6:7, 8:5, 8:10, 8:18, 8:21, 10:9, 26:18
**underpinnings** [2] - 16:23, 26:21
**UNITED** [1] - 1:1
**United** [10] - 14:11, 14:19, 14:20, 14:22, 15:4, 15:8, 15:11, 15:12, 28:7, 36:7
**unlawful** [1] - 17:4
**unlawfully** [1] - 7:16
**unless** [4] - 5:12, 9:12, 9:13, 26:14
**unpleasant** [2] - 8:19, 8:21
**unusual** [1] - 7:2
**up** [7] - 6:1, 6:15, 7:2, 7:17, 16:4, 24:3, 32:12
**upset** [1] - 16:7
**US** [1] - 25:13

## V

**variety** [4] - 7:11, 7:12, 27:4, 33:5
**versus** [5] - 4:6, 4:7, 20:10, 28:7, 30:19
**Vicente** [1] - 2:13
**victims** [3] - 33:14, 33:15
**view** [2] - 6:5
**violate** [1] - 20:5
**violation** [13] - 18:24, 19:1, 20:12, 20:17, 20:25, 21:1, 25:7, 25:13, 25:20, 27:19,

28:13, 28:16, 34:24
**violations** [2] - 21:3, 21:4
**visit** [1] - 20:6
**Von** [4] - 7:22, 8:8, 12:2, 24:5
**vS** [1] - 1:12

## W

**waiting** [1] - 32:13
**War** [3] - 20:15, 22:10, 33:14
**war** [1] - 8:6
**Washington** [1] - 3:6
**ways** [1] - 23:7
**well-established** [1] - 13:7
**whatsoever** [2] - 9:22, 9:24
**whole** [1] - 33:4
**wholly** [1] - 12:5
**winds** [1] - 16:4
**wiped** [1] - 20:22
**wishes** [1] - 29:13
**works** [1] - 25:25
**World** [3] - 20:15, 22:10, 33:14
**written** [1] - 8:12

## Y

**Year** [1] - 32:20
**years** [7] - 10:17, 12:25, 25:23, 32:6, 33:7, 34:6
**Young** [1] - 9:19
**yourself** [1] - 17:24